**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jerry D. MITCHELL,
Defendant-Appellant.**

No. 76–2908.

United States Court of Appeals,
Fifth Circuit.

June 13, 1977.

Theodore J. Sakowitz, Federal Public Defender, Edward B. Galante, Asst. Federal Public Defender, Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Nathaniel H. Speights, Thomas M. Sherouse, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before WISDOM and GEE, Circuit Judges, and BOOTLE,* District Judge.

WISDOM, Circuit Judge:

This appeal turns on whether the Marine Mammal Protection Act of 1972 (MMPA), 16 U.S.C. § 1361 *et seq.*, and related regulations, 50 C.F.R. § 216.11 (1974), apply to an American citizen taking dolphins within the territorial waters of a foreign sovereign state. The defendant-appellant, Jerry Mitchell, is an American citizen convicted of violating the Act by capturing 21 dolphins within the three-mile limit of the Commonwealth of the Bahamas. We hold that the criminal prohibitions of the Act do not reach conduct in the territorial waters of a foreign sovereignty. We reverse the conviction.

## I.

The parties stipulated that Mitchell had a Bahamian work permit to capture the dolphins (Atlantic Bottlenose Dolphins). He admits taking them during 1974 while employed by George Curtis Johnson, the owner of Seafloor Aquarium, a marine attraction in Nassau, Bahamas. Johnson, a Bahamian citizen, obtained Mitchell's permit from the Bahamian government with the intention of exporting dolphins to Great Britain. Seafloor paid the defendant $800 for each captured dolphin. None of the dolphins were imported into the United States.

The Government's evidence as to its practices in issuing permits applicable to American citizens in foreign territorial waters suffers from a lack of clarity. According to government witnesses, in March 1973 the

* Senior District Judge of the Middle District of Georgia sitting by designation.

National Marine Fisheries Service of the Department of Commerce (NMFS) learned of Mitchell's plan to establish a dolphin-capturing business. Charles Fuss, Chief of Law Enforcement for the Service, and another agent met with Mitchell and an Englishman to discuss the proposed venture, which at that time was to be based in Haiti. Fuss testified that he cautioned Mitchell that the moratorium provision of MMPA prohibited American citizens from capturing marine mammals anywhere, and he advised Mitchell to seek legal advice, both from a lawyer and from the Service's Washington office. Fuss stated that Seafloor would not be granted a United States permit to capture dolphins because "that facility is located in a foreign country".

W. A. Haskell, a Florida agent for the Service, testified that Mitchell telephoned him on March 20, 1973, and asked what he should do to obtain a permit to capture marine mammals and when the Marine Mammal Commission would be appointed. Haskell informed Mitchell that he would need a permit from the Commission, but that he did not know when the Commission would be appointed.

Rupert Bonner, a staff assistant with the Service's Washington office, in charge of processing permits, testified that he would not be able to issue Seafloor or Mitchell a permit because "We do not issue permits in other countries". But he also stated: "[W]e would allow that the animal be taken in another country if it was approved by the country in which the applicant stated it would be taken." When recalled to the stand to clarify his testimony, he testified on re-direct examination that he had issued permits to allow the capture of dolphins in Mexico and Canada. On cross-examination he was asked: "Are your permits issued to Seaquariums and Seafloor-like institutions that are wholly owned by Americans for taking dolphins in the territorial waters of [a foreign] nation?" He answered, compounding the confusion, "They are not, no."

The Government introduced two letters in evidence, both from Fuss, but drafted by Haskell. The first, dated January 23, 1974, referred only to importation of dolphins. It enclosed a copy of the 1973 regulations. It stated, in principal part: "It has come to our attention that you intend to import certain marine mammals from abroad. . . . Before importing any marine mammals or marine mammal products into the United States, you must comply with the requirements of Section 216.14 as cited above." Mitchell never had any intention to import dolphins into the United States. The second letter, dated May 7, 1974, stated that it has "come to our attention that you proposed to move to the Bahama Islands and set up a porpoise catching operation". It enclosed a copy of the 1974 revisions in the regulations and quoted Section 216.11c, that a "prohibited taking" applied to "[a]ny person subject to the jurisdiction of the United States . . . tak[ing] any marine mammal during the moratorium".

Mitchell testified that as a result of his conversation with Fuss he consulted an attorney. The attorney, James E. Nelson of Miami, whose firm had handled the incorporation of Mitchell's business, advised him that his activities in the Bahamas would be lawful. The defendant also testified that Fuss did not know at the time of their meeting if it (dolphin capturing in Bahamian waters) was legal or not. Government counsel no doubt confused the jury and the defendant by asking "Do you recall the letter of January 23, 1974, that Agent Haskell sent with regard to the New Marine Mammal Protection Act, and U.S. citizens would be violating the law no matter where they captured dolphin". This statement was not contained in the letter; the letter dealt only with importation of marine mammals. Mitchell was asked the same question with regard to the letter of May 7, which also lacks the statement on which the question was predicated. Mitchell confused the issue by answering "yes" to both questions. He also admitted that he had read the regulations attached to the letters. Nevertheless, he continued his operations in the territorial waters of the Bahamas because his lawyer advised that he was not subject to the jurisdiction of the United States.

In a 32-count indictment, the Government charged Mitchell with taking four dolphins on May 11, 1974, nine in June or July, and two on August 9, all in violation of the NMFS regulation.[1] Stated without a geographical restriction, the regulation purports to prohibit all unauthorized takings of marine mammals by United States citizens. The indictment also charged that Mitchell possessed these same dolphins in violation of another regulation[2] and that he transported and sold the animals in violation of the same provision. The jury found Mitchell guilty of these twenty-three counts, as well as of one count of conspiracy to violate the Act and the regulations. The jury acquitted the defendant of eight counts of taking, possessing, transporting, and selling six dolphins in violation of the MMPA sections prohibiting takings on the high seas,[3] possession of illegally taken mammals,[4] and transport or sale of such mammals.[5]

The district court entered judgment on the jury's verdict and sentenced Mitchell to a period of ninety days incarceration on the conspiracy charge and one year probation on each remaining count. The periods of probation were to run consecutively with the confinement and concurrently with each other. Of the three grounds urged on appeal for reversal[6], we consider only the question of the extraterritorial scope of the statute.

## II.

Congress passed the Marine Mammal Protection Act in 1972 after finding that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities". 16 U.S.C. § 1361(1). Section 1361(2) states, in part:

such species and population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and, consistent with this major objective, they

1. 50 C.F.R. § 216.11 (1974) states in part:
   Except as otherwise provided in Subparts C and D of this Part 216, it is unlawful for;

   (c) Any person subject to the jurisdiction of the United States to take any marine mammal during the moratorium.
   The violation of this regulation becomes a crime pursuant to 16 U.S.C. § 1375, which states in part:
   (b) Any person who knowingly violates any provision of this subchapter or of any permit or regulation issued thereunder shall, upon conviction, be fined not more than $20,000 for each violation, or imprisoned for not more than one year, or both.

2. 50 C.F.R. § 216.13 (1974) states in part:
   It is unlawful for:

   (b) Any person subject to the jurisdiction of the United States to possess any marine mammal taken in violation of the Act or these regulations or to transport, sell, or offer for sale any such marine mammal or any marine mammal product made from any such mammal.

3. 16 U.S.C. § 1372(a) states in part:
   Except as provided in sections 1371, 1373, 1374, 1381, and 1383 of this title, it is unlawful—
   (1) for any person subject to the jurisdiction of the United States or any vessel or other conveyance subject to the jurisdiction of the United States to take any marine mammal on the high seas; . . .

4. 16 U.S.C. § 1372(a) states in part:
   Except as provided in sections 1371, 1373, 1374, 1381, and 1383 of this title, it is unlawful—
   (3) for any person, with respect to any marine mammal taken in violation of this subchapter—
   (A) to possess such mammal . . . .

5. 16 U.S.C. § 1372(a) states in part:
   Except as provided in sections 1371, 1373, 1374, 1381, and 1383 of this title, it is unlawful—
   (3) for any person, with respect to any marine mammal taken in violation of this subchapter—
   (B) to transport, sell, or offer for sale any such mammal or any marine mammal product made from any such mammal . . . .

6. The appellant argued (a) that the indictment did not allege facts necessary to charge an offense against the United States, (b) that the district court erred by instructing the jury on an offense not charged in the indictment, and (c) that the criminal prohibitions of the Act should not apply extraterritorially to conduct wholly within another sovereignty. Because the third ground provides a sufficient basis for reversal, we do not consider the first two arguments.

should not be permitted to diminish below their optimum sustainable population.

To attain this goal, section 1371[7] establishes what the Conference Report terms a "permanent moratorium." This is defined as a "complete cessation of the taking of marine mammals and a complete ban on the importation into the United States of marine mammals and marine mammal products, except as provided in this chapter". *Id.* at § 1362(7). During the moratorium, however, the Secretary of Commerce may issue permits for the taking of marine mammals for various purposes, including public display, provided that the taking is reviewed by the Marine Mammal Commission and the Committee of Scientific Advisors on Marine Mammals established by the Act. The Commission and Committee must recommend approval of any proposed taking that is consistent with the purposes stated in section 1361. *Id.* at § 1371(a). After consultation with the Commission, the Secretary must promulgate regulations governing takings, importation, permits, applications for permits, and general waivers of the moratorium. *Id.* at §§ 1373(a), 1374(b), 1371(a)(3)(A). The statute does not attempt to define the geographic extent of the moratorium.

The Act also announces a series of specific prohibitions with clear geographic scope. *Id.* at § 1372. Except as permitted by regulation, permit, or treaty, "it is unlawful—for any person subject to the jurisdiction of the United States . . . to take any marine mammal on the high seas", *id.* at § 1372(a)(1), or from the "waters or on lands under the jurisdiction of the United States", *id.* at § 1372(a)(2)(A). It is also

unlawful for any person to "possess any such mammal; or to transport, sell or offer for sale any such mammal", *id.* at § 1372(a)(3), or "to import into the United States . . . any marine mammal taken in violation" of the Act or "taken in another country in violation of the law of that country", *id.* at § 1372(c)(1). In Section 1375(b) Congress imposed criminal liability on those who knowingly commit violations of the Act, regulations, or permit conditions.

This legislative scheme is a hybrid of the bill reported by the House Merchant Marine and Fisheries Committee, which did not include a separate moratorium section, and the bill reported by the Senate Commerce Committee, which did. According to the House Report, the principal element of the House bill was the prohibitions section, now section 1372 of the Act. The Committee reasoned that a de facto moratorium would develop from the prohibitions because any taking without a permit would be deemed unlawful. H.R.Rep.No.707, 92d Cong., 1st Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News p. 4144. Nevertheless, a five-year moratorium was added to the measure on the floor of the House. 118 Cong.Rec. 7704 (1972). The sponsors of the amendment did not discuss its geographic scope. They apparently intended to expand the protection of the bill by limiting the purposes for which permits could be issued. *See id.* at 7698, 7701. The Senate version originally proposed a 15-year moratorium in addition to the prohibitions. S.Rep. No. 863, 92 Cong., 2d Sess. 13 (1972). The Committee report does not explain the need for both

---

7. 16 U.S.C. § 1371 states in part:

   (a) There shall be a moratorium on the taking and importation of marine mammals and marine mammal products, commencing on the effective date of this chapter, during which time no permit may be issued for the taking of any marine mammal and no marine mammal or marine mammal product may be imported into the United States except in the following cases:

   (1) Permits may be issued by the Secretary for taking and importation for purposes of scientific research and for public display if—

   (A) the taking proposed in the application for any such permit. . . .

   . . . . .

   is first received by the Marine Mammal Commission and the Committee of Scientific Advisors on Marine Mammals . . . .. The Commission and Committee shall recommend any proposed taking or importation which is consistent with the purposes and policies of section 1361 of this title.

the moratorium and the prohibitions. In fact, the report demonstrates the interrelated nature of the sections. After explaining the establishment of the moratorium, the report adds:

> There are certain important exceptions to this moratorium:
>
> (1) The prohibitions of the Act do not apply to the taking or importation of mammals or marine mammal products pursuant to international agreements. Thus, no permit is necessary (and therefore the moratorium does not apply) to the taking of Alaska fur seals pursuant to the North Pacific Fur Seal Convention.
>
> . . .

Consequently, it is not clear from the Senate Report or from the legislative history as a whole whether the moratorium was intended to have broader territorial effect than the prohibitions, which do not reach conduct in the territory of other sovereigns.

### III.

█ Mitchell argues that Congress did not intend to exercise its legislative authority to establish subject matter jurisdiction over takings, possessions, and sales of marine mammals in foreign countries. He concedes, as he must, that Congress has the power to control the conduct of American citizens overseas. The Supreme Court has held repeatedly that the legislative authority of the United States over its citizens extends to conduct by Americans on the high seas and even within the territory of other sovereigns.[8] In *Blackmer v. United States*, 1932, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375, for example, the Court held that a district court had subject matter jurisdiction to hold an American citizen residing in Paris in criminal contempt for failure to return to the United States in reply to a subpoena. More recently, this Court relied on *Blackmer* to uphold the power of a district court to try for criminal contempt a prospective witness who refused to return from Israel to testify. *United States v. Lansky*, 5 Cir. 1974, 496 F.2d 1063, 1067, *rehearing denied en banc*, 502 F.2d 1168.[9] As the Restatement explains, international law principles do not constrain this legislative authority, because citizenship alone is generally recognized as a relationship sufficient to justify the exercise of jurisdiction by a state. Restatement (Second) of the Foreign Relations Law of the United States § 30 (1965). *See also United States v. Black*, S.D.N.Y. 1968, 291 F.Supp. 262, 266.[10] Consequently, Mitchell poses a question not about the authority of Congress but instead about the congressional purposes embodied in the statute.

**8.** *Steele v. Bulova Watch Co.*, 1952, 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (the United States possesses authority to regulate trademark infringements by an American citizen in Mexico); *Foley Bros. v. Filardo*, 1949, 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680 (Congress possesses the authority to control overtime pay of workers in the employ of American contractors in Iran and Iraq, but it did not intend to exercise its power); *Vermilya-Brown Co. v. Connell*, 1948, 335 U.S. 377, 69 S.Ct. 140, 93 L.Ed. 76, *reh. denied*, 1949, 336 U.S. 928, 69 S.Ct. 652, 93 L.Ed. 1089 (although Congress did not intend such an extension, the United States could apply the Fair Labor Standards Act to employment relationships involving American citizens in Bermuda); *Blackmer v. United States*, 1932, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (the contempt power may reach United States citizens residing overseas); *Cook v. Tait*, 1924, 265 U.S. 47, 44 S.Ct. 444, 68 L.Ed. 895 (the United States has the authority to tax the income that an American citizen, permanently domiciled in Mexico, earned from Mexican property); *United States v. Bowman*, 1922,

260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (the criminal jurisdiction of the United States extends to frauds on the Government executed on the high seas and in Brazil).

**9.** Lansky's conviction for criminal contempt was reversed on other grounds. *United States v. Lansky*, 5 Cir. 1974, 496 F.2d 1063, 1971–72.

**10.** Section 37 of the Restatement also says that concurrent jurisdiction by two sovereigns over the same conduct does not necessarily oust either state from jurisdiction. Even though citizenship is an internationally recognized basis of jurisdiction, congressional action will not be extended extraterritorially, as a matter of statutory construction, merely because the object of the statute is an American citizen. Usually, Congress, is presumed to intend only territorial application unless contrary intent appears in the statute. Restatement (Second) of the Foreign Relations Law of the United States § 38 (1965).

■ Two principles of statutory construction must be considered in determining whether Congress intended to apply the criminal prohibitions of the MMPA extraterritorially. First, *United States v. Bowman*, 1922, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149, requires us to examine the nature of the law:

> [Some laws] are such that to limit their *locus* to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the *locus* shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.

*Id.* at 98, 43 S.Ct. at 41, *quoted in Stegeman v. United States*, 9 Cir. 1970, 425 F.2d 984, 986 (en banc), *cert. denied*, 400 U.S. 837, 91 S.Ct. 74, 27 L.Ed.2d 70. Second, if the nature of the law does not mandate its extraterritorial application, then a presumption arises against such application. *Bowman*, 260 U.S. at 98, 43 S.Ct. 39; *accord Steele v. Bulova Watch Co.*, 1952, 344 U.S. 280, 285, 73 S.Ct. 252, 97 L.Ed. 319; *Foley Bros. v. Filardo*, 1949, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680; *Airline Stewards and Stewardesses Ass'n v. Trans World Airlines*, 2 Cir. 1959, 273 F.2d 69, 70, *cert. denied*, 362 U.S. 988, 80 S.Ct. 1075, 4 L.Ed.2d 1021. To overcome the presumption and to apply the statute beyond the territory of the United States, the Government must show a clear expression of congressional intent. *Steele*, 344 U.S. at 285, 73 S.Ct. 252; *Foley Bros.*, 336 U.S. at 285, 69 S.Ct. 575.[11]

■ With regard to the first proposition, the nature of the MMPA does not compel its application in foreign territories. The MMPA is a conservation statute, designed to preserve marine mammals. The nature of such a bill is based on the control that a sovereign such as the United States has over the natural resources within its territory. It can exploit them or preserve them or establish a balance between exploitation and preservation. *See, e. g.*, 16 U.S.C. §§ 1131, 1361, 1371(a)(2), 1531, 1539. The nature of such control is not limited to the sovereignty of the United States. Other sovereign states enjoy similar authority. For example, the United Nations resolution on "Permanent Sovereignty over National Resources", G.A.Res. 1803, 17 U.N. GAOR 1193–94 (1962), recognizes the control of sovereigns over the natural resources within their territories, including the ability to nationalize or expropriate such resources from private ownership. Restatement (Second) of the Foreign Relations Law of the United States § 185 (1965) (Reporters' Note 4). In addition, Article 14 of the Convention on the Territorial Sea and the Contiguous Zone, April 29, 1958, states that the passage of foreign fishing vessels shall not be considered innocent if the crews do not observe the laws promulgated by coastal states to prevent such vessels from fishing in territorial seas. Thus each sovereign may regulate the exploitation of natural resources within its territory. *Id.* at § 45 (Reporters' Note 1).

When Congress considers environmental legislation, it presumably recognizes the authority of other sovereigns to protect and exploit their own resources. Other states may strike balances of interests that differ substantially from those struck by Congress. The traditional method of resolving such differences in the international community is through negotiation and agreement rather than through the imposition of one particular choice by a state imposing its law extraterritorially. With regard to the MMPA, Congress stated in section 1383 that the Act is not intended to contravene "the provisions of any existing international treaty, convention, or agreement, or any

---

11. The Restatement (Second) of the Foreign Relations Law of the United States § 38 (1965) (Reporters' Note 1) states in part:

Federal legislation is usually construed to apply only to conduct taking place within the territory of the United States unless otherwise provided. . . .

Federal statutes designed to be applied to conduct taking place outside the United States usually expressly so provide. . . .

statute implementing the same, which may otherwise apply to the taking of marine mammals". Furthermore, section 1378 establishes the United States approach to international protection of marine mammals by directing the Secretary of State to initiate negotiations for both bilateral and multilateral agreements on the subject. The basic purpose of the moratorium, prohibitions, and permit system therefore appears to be the protection of marine mammals only within the territory of the United States and on the high seas. Conservation in other states is left to diplomatic negotiations. Restricting the territorial scope of the Act would not "greatly curtail the scope and usefulness of the statute"[12] nor frustrate its purpose. We cannot then infer from the nature of the MMPA that Congress intended to apply its restrictions to the territories of foreign sovereigns.[13]

With regard to the second proposition of statutory construction, neither the statute nor its legislative history provide a clear expression of congressional intent for application of the Act in foreign territories.[14]

**12.** *United Staes v. Bowman*, 1922, 260 U.S. 94, 98, 43 S.Ct. 39, 67 L.Ed. 149.

**13.** The territorial nature of conservation statutes is also indicated by the conflict of national interests that is created by the attempt of one state to regulate resource development in another state. *See* Note, *Extraterritorial Application of United States Laws: A Conflict of Laws Approach*, 28 Stan.L.Rev. 1005, 1036 (1976).

**14.** The appellant argues that the legislative history of the Act indicates that Congress expressly rejected the extraterritorial application of the Act. In support of that position, counsel quotes the language from the House Report:
In its deliberations, the Committee gave careful thought to the possibility of imposing restrictions upon U.S. citizens and companies engaging in activities in foreign countries which would not be permitted to them in the United States. . . . Ultimately, the decision was made not to include the authority

. . . .

H.R.Rep.No.707, 92d Cong., 1st Sess. ——, *reprinted in* [1972] U.S.Code Cong. & Ad.News pp. 4144, 4154. We are not impressed. As quoted, the language does support the appellant's argument. But the language is quoted out of context. The full paragraph from which

First, section 1371, which announces the moratorium, and section 1362(7), which defines it, do not deal with the geographic scope of the ban on takings and importation. The Government argues that the definition of the moratorium is absolute: "'moratorium' means a complete cessation of the taking of marine mammals and a complete ban on the importation into the United States of marine mammals . . . ." The Government therefore concludes that the geographic scope of the moratorium should extend world wide. In *Foley Bros. v. Filardo*, 1949, 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680, however, the statute in question used all-inclusive language:

Every contract hereafter made to which the United States . . . is a party, and every such contract made for or on behalf of the United States . . . which may require or involve the employment of laborers or mechanics shall contain a provision that no laborer or mechanic doing any part of the work contemplated by the contract . . . shall be required or permitted to work more than eight hours in any one calendar day upon such work . . . .

the language is taken shows that Congress was referring to funds invested in foreign corporations. The full paragraph reads:
In its deliberations, the Committee gave careful thought to the possibility of imposing restrictions upon U.S. citizens and companies engaging in activities in foreign countries which would not be permitted to them in the United States. This was done as the result of suggestions made during the course of the hearings which indicated that there might be significant U.S. investments in companies taking animals from depleted or endangered species or stocks. Ultimately, the decision was made not to include the authority to require the repatriation of funds used for this purpose, largely on the basis that there was no solid information available on which a judgment might be made. The matter does continue to be of considerable interest, however, and it is the expectation of the Committee that the affected Departments of the government and the Marine Mammal Commission will look into this question and will report back on the need for legislation to plug what may or may not be a loophole in H.R.10420.
*Id.*

40 U.S.C. § 324 (1946). Nevertheless, the Supreme Court concluded that the statute and its legislative history did not evidence intent specifically for extraterritorial application. The Court held that the Eight Hour Law did not cover American employees working for American contractors in Iraq and Iran. Similarly, with regard to the MMPA all inclusive language that does not expressly address territoriality cannot be held to indicate clear intent for extraterritorial application.

Second, when Congress did define the geographic scope of the prohibitions in section 1372, it did not make conduct in foreign territory unlawful. Takings without permits were prohibited only in United States territory and on the high seas. The omission of the territory of other sovereigns permits the reasonable inference that Congress concluded the prohibitions should not extend extraterritorially.

Third, the permit system established in sections 1373 and 1374 does not seem to contemplate extraterritorial jurisdiction. No mammal may be taken without a permit under sections 1371 and 1372. Any permit issued must be consistent with regulations established under section 1373. And the regulations must be promulgated "on the basis of the best scientific evidence available and in consultation with the Marine Mammal Commission". How the Secretary of Commerce or the Commission would gather scientific evidence to promulgate regulations regarding takings in other sovereign countries is unclear. Because of the reliance on scientific data, the permit system seems designed for application in the United States and on the high seas where such data may be collected without restriction from other jurisdictions. The inference again arises that extraterritorial application beyond the high seas was not intended.

Fourth, the legislative history expressly discussed one conservation problem in the territorial waters of another sovereign, namely the annual hunt of baby harp seals off the Canadian coast. H.R.Rep.No.707, 92d Cong., 1st Sess. reprinted in [1972] U.S. Code Cong. & Ad.News pp. 4144, 4149. The committee noted the "great public concern and indignation" over the hunt. *Id.* In response, however, it proposed only a ban on importing the skins from the animals. It could have forbade Americans from participating in the hunt. But the legislative history indicates no such intent and does not suggest that any provision of the statute would do so.

Fifth, the addition of the moratorium to the House bill provides no insight into whether the five-year moratorium was to extend the territorial reach of the Act beyond the scope indicated by the prohibitions. The debate on the amendment does not include any discussion of territoriality. *See* 118 Cong.Rec. 7698–7704 (1972). Although the sponsors of the amendment viewed the moratorium as providing additional protection for the animals, the primary effect discussed on the floor, and the only effect indicated by the words of the amendment, was to deny the Secretary the authority to issue permits except in certain limited circumstances. 118 Cong.Rec. 7700 *et seq.* It is no small matter when, in effect, this nation countermands a permit of another nation allowing the permittee to work in the territorial waters of the foreign country. We cannot say that the interests of the United States in preserving dolphins outweighs the interest of the Commonwealth of the Bahamas in preserving its character as a tourist attraction by the issuance of a limited number of permits for the capture of dolphins within its narrow band of territorial waters. If the moratorium was meant to extend the reach of the statute to the territorial waters of every country in the world, the sponsors of the amendment would certainly have recognized a duty to explain the need for such an extension on the floors of Congress and in the committee reports.

In summary, then, the Act and its legislative history do not demonstrate the clear intent required by *Bowman* and its progeny to overcome the presumption against extraterritorial extension of American statutes. Congress did extend the force of the MMPA

to the high seas,[15] but any further extension to regulate the taking of marine mammals in the territory of other sovereign states is not justified by the Act. The legislative scheme requires the State Department to pursue international controls by the usual methods of negotiation, treaty, and convention. Without a clearer expression from Congress to the contrary, we must presume that United States jurisdiction under the Act ceases at the territorial waters and boundaries of other states.

## IV.

Mitchell's conviction rests on his violation of a regulation of the National Marine Fisheries Service, 50 C.F.R. § 216.11(c), which prohibits any person subject to United States jurisdiction from taking any marine mammal during the moratorium. The Service promulgated the provision to implement the MMPA, *see* 50 C.F.R. § 216.1, and its authority to regulate conduct is limited by the scope of the Act. The Administrative Procedure Act instructs us to set aside agency action "in excess of statutory jurisdiction authority, or limitations". 5 U.S.C. § 706(2)(C); *see Leedom v. Kyne*, 1958, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210. In this case the regulation purports to extend jurisdiction beyond United States territory and the high seas to control the conduct of an American citizen in the Bahamas. The force of the provision cannot validly extend beyond the high seas, however, because the statutory authority created by Congress does not extend to the territory of foreign sovereigns. Any such extension must be set aside as agency action in excess of statutory authority.

The judgment is REVERSED.

---

**15.** Although the briefs disputed the definition of the term "high seas", the Government conceded in oral argument that the definition, for the purposes of the Act, excludes the territorial waters of sovereign states. *Accord*, Convention of the High Seas, 13 U.S.T. 2312, T.I.A.S. 5200, 450 U.S.T.S. 82 (1962), 16 U.S.C. § 1802(13) (Supp.1976); 33 C.F.R. § 2.05–1(a) (1976); 33 C.F.R. § 2.10–1(a) (1974).