**Sandra Jean SMITH, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 87–883–FR.**

United States District Court,
D. Oregon.

Jan. 6, 1989.

Allen T. Murphy, Jr., Portland, Or., for plaintiff.

John R. Bolton, Asst. Atty. Gen., Charles H. Turner, U.S. Atty., Jack C. Wong, Asst. U.S. Atty., Paul F. Figley, Asst. Director, Jo Brooks, Trial Atty., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

FRYE, District Judge.

In the matter before the court, defendant, United States of America, moves the court for an order dismissing plaintiff, Sandra Jean Smith's, complaint pursuant to Rules 12(b)(1) and 12(h)(3) of the Federal Rules of Civil Procedure on the basis that the court lacks jurisdiction over the subject matter of the action.

## BACKGROUND

The agreed facts are set forth in Exhibit A of the Pretrial Order attached hereto.

Plaintiff brings this wrongful death action invoking the court's subject matter jurisdiction pursuant to the Federal Torts Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. (FTCA). Plaintiff asserts that the United States negligently caused her husband's death by failing to adequately warn him that there were dangerous crevasses in areas off the flagged paths.

In order to establish jurisdiction under the FTCA, plaintiff has the burden to demonstrate that her case falls within the parameters described by 28 U.S.C. § 1346(b) and that it does not fall within any of the FTCA's exceptions to the limited waiver of sovereignty by the United States.

The United States asserts that this court does not have subject matter jurisdiction over plaintiff's claim which arose in Antarctica because 1) the FTCA was meant to apply only within the territorial jurisdiction of the United States; 2) Antarctica is a "foreign country" as that term was used by Congress when it explicitly retained the government's sovereign immunity for "[a]ny claim arising in a foreign country," 28 U.S.C. § 2680(k); and 3) plaintiff cannot demonstrate "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b), because Antarctica has no civil law.

Plaintiff asserts that the FTCA was intended to apply to a foreign country without a government and without laws, and that the FTCA does not limit the liability of the United States to acts occurring within the territorial boundaries of the United States.

## ANALYSIS AND RULING

The FTCA acts as waiver of sovereign immunity in specified types of cases. Section 2680 of the FTCA lists several exceptions to that waiver. Section 2680 provides that "[t]he provisions of this chapter and section 1346(b) of this title shall not apply to ... (k) [a]ny claim arising in a foreign country." Plaintiff's claim arose in Antarctica and is barred if Antarctica is a "foreign country" within the meaning of the FTCA.

The provision against the extraterritorial application of the FTCA in section 2680(k) is consistent with an important canon of statutory construction that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949). The presumption against the extraterritorial application of a statute is not absolute in that it can be overcome by "a clear expression of congressional intent." *United States v. Mitchell*, 553 F.2d 996, 1002 (5th Cir.1977); *see also Foley*, 336 U.S. at 285, 69 S.Ct. at 577.

In *Meredith v. United States*, 330 F.2d 9 (9th Cir.1964), the court held that an action arising from acts and omissions which occurred within the physical confines of the American Embassy at Bangkok, Thailand was barred by the foreign country exception in section 2680(k). The Ninth Circuit

stated that "[t]he phrase 'in a foreign country' is used in section 2680(k) with the meaning dictated by 'common sense' and 'common speech.' " *Meredith*, 330 F.2d at 11 (citations omitted). The court stated that the appellant's position that the FTCA was intended to extend to persons injured on premises occupied by foreign embassies and consulates of the United States is "incompatible with the rule that, in the absence of an indication to the contrary, legislation is intended to apply 'only within the territorial jurisdiction of the United States.' " *Meredith*, 330 F.2d at 11 (citations omitted).

This court finds nothing in the FTCA that would indicate that Congress intended for the FTCA to apply to acts or omissions which arose in Antarctica. The common sense and common speech meaning of the phrase "in a foreign country" used in section 2680(k) includes Antarctica in that it is not within the territorial jurisdiction of the United States. There is no indication that Congress intended to exclude from the common sense meaning of the phrase "in a foreign country" regions that while not within the territorial jurisdiction of the United States, are not under the domination of another foreign nation or country, assuming for the sake of argument that Antarctica can be considered to be governless.

Furthermore, to apply the FTCA to torts occurring in stateless foreign regions would lead to unnecessary inconsistencies within the provisions of the FTCA itself. The choice of law provision of the FTCA reads, in relevant part, as follows:

[T]he district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States ... under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred.*

28 U.S.C. § 1346(b) (1982) (emphasis added).

The Supreme Court has made clear that a court should apply this language precisely as it appears:

In the Tort Claims Act Congress has expressly stated that the Government's liability is to be determined by the application of a particular law, the law of the place where the act or omission occurred, and we must, of course, start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used. We believe that it would be difficult to conceive of any more precise language Congress could have used to command application of the law of the place where the negligence occurred than the words it did employ in the Tort Claims Act.

*Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492, (1962) (footnote omitted).

To adopt the plaintiff's position would require this court to apply the civil law of Antarctica which has no civil law to apply. This court would then have to bypass the "precise language," *Richards*, 369 U.S. at 9, 82 S.Ct. at 591, of Congress and apply the law of a place where all parties acknowledge the negligence did *not* occur.

This court acknowledges that the Circuit Court for the District of Columbia reached a contrary conclusion in *Beattie v. United States*, 756 F.2d 91 (D.C.Cir.1984), holding that the exception in section 2680(k) applies only where "the government of a foreign nation has or asserts sovereignty" and not to Antarctica which "is not a country at all." *Beattie*, 756 F.2d at 94. However, this court concludes that the precedent set in *Meredith* supports the dissenting opinion in *Beattie*. The *Meredith* case supports the conclusion that section 2680(k) is properly interpreted to limit the application of the FTCA to the territorial jurisdiction of the United States. *Meredith*, 330 F.2d at 11. This interpretation is dictated by the fact that there is no clear expression of congressional intent in the FTCA to apply the legislation outside of the territorial boundaries of the United States, and it avoids the creation of internal inconsistencies within the precise language of the statute.

The United States's motion to dismiss on the grounds that this court lacks subject

matter jurisdiction over this action is granted.

## EXHIBIT A

The following facts are agreed to by the parties and require no further proof:

1. Plaintiff resides at 14222 N.E. Milton, Portland, Oregon.

2. Plaintiff Sandra Jean Smith is the widow of and the duly appointed personal representative of the estate of John Emmett Smith, deceased (sometimes referred to as "decedent").

3. Prior to filing suit, plaintiff Sandra Jean Smith timely presented an administrative claim to the appropriate federal agency in her capacity as personal representative of the estate of John Emmett Smith.

4. Plaintiff's administrative claim was finally denied by the agency in writing on or about July 13, 1987.

5. Plaintiff commenced suit within six months after the date of mailing of the letter denying the administrative claim she had filed.

6. Plaintiff's complaint seeks money damages on behalf of her husband's estate for his personal injury and death.

7. Commencing on or about October 21, 1986, decedent was employed by ITT Antarctic Services, Inc. ("ITT/ANS"), as a carpenter.

8. Mr. Thomas Powell and Mr. Matthew Kaz were also employed by ITT/ANS.

9. Decedent was assigned by ITT/ANS to help construct buildings at McMurdo Station, which is on Ross Island, Antarctica.

10. Decedent arrived at McMurdo Station, Antarctica, on October 27, 1986.

11. Mr. Powell and Mr. Kaz also arrived at McMurdo Station, Antarctica, on October 27, 1986.

12. Upon arrival at McMurdo Station on October 27, 1986, Mr. Smith, Mr. Powell, and Mr. Kaz attended an indoctrination briefing. The speakers at the briefing were Art Brown, an employee of ITT/ANS, and David M. Bresnahan, an employee of the National Science Foundation ("NSF").

13. At the briefing, Mr. Brown and/or Mr. Bresnahan noted that Antarctica is a dangerous place, and that it was important to remember that fact and not to be lulled into a sense of security.

14. The briefing also covered, among other topics, the requirement to file a foot plan when participating in off-base recreational travel.

15. The National Science Foundation and the Department of the Navy are agencies of the United States and their employees are federal employees for purposes of the FTCA.

16. ITT Antarctic Services, Inc., is not an agency of the United States and its employees are not federal employees for purposes of the FTCA.

17. The United States maintains a presence in Antarctica responsive to the United States' scientific, economic, and political objectives.

18. The NSF has responsibility for the United States' research effort in Antarctica. In 1959 it established the U.S. Antarctic Research Program ("USARP"). Budgetary responsibility for the program, including the funding of logistic support activities, rests with the NSF.

19. The NSF draws upon the logistic support capabilities of the Department of the Navy in operating the United States Antarctic Research Program.

20. The NSF has contracted with ITT/ANS for construction and other specialized functions at McMurdo Station, as well as for services at other locations in Antarctica.

21. McMurdo Station is the primary logistics facility for airborne resupply of inland stations and for USARP field science projects in Antarctica.

22. Both the United States Navy and ITT/ANS provide various services and operate and maintain facilities and utilities at McMurdo Station and its airfield, Williams Field.

23. Castle Rock is located outside McMurdo Station.

24. The Castle Rock hike route and the area where Mr. Smith fell into a crevasse were not depicted on the map posted outside the galley.

25. The United States neither owns nor exercises sovereignty over the area where Mr. Smith fell into a crevasse.

26. One of the contractual conditions of Mr. Smith's employment with ITT/ANS required him to comply with all laws and regulations, both civil and military, applicable at the work site and the vicinity thereof.

27. One of the conditions applicable to Mr. Smith and his hiking companions was compliance with "COMNAVSUPPFORANTARCTICA INSTRUCTION 5101.2," which sets forth off-base travel procedures in Antarctica.

28. Off-base recreational travel governed by "COMNAVSUPPFORANTARCTICA INSTRUCTION 5101.2," includes travel to Castle Rock.

29. Mr. Smith and his companions Mr. Powell and Mr. Kaz took a recreational hike to Castle Rock on November 23, 1986.

30. The hike to Castle Rock was marked by a flagged route. There were no black flags on or off the flagged route.

31. Mr. Smith and his companions filed a foot plan as required by "COMNAVSUPPFORANTARCTICA INSTRUCTION 5101.2."

32. Mr. Smith and his companions did not seek nor did they obtain permission to deviate from the flagged route to Castle Rock.

33. No signs are posted at the beginning of the flagged route to Castle Rock, or along the path, advising hikers not to leave the flagged route and/or that there were crevasses in the area if they travelled off the flagged route.

34. On their way to Castle Rock, Mr. Smith and his companions hiked along the flagged route.

35. Mr. Smith and his companions hiked along the flagged route part of the way back to McMurdo Station. Then they broke away from the flagged route to hike across a snow field in the direction of Scott Base.

36. Scott Base is a New Zealand base which is located near to McMurdo Station.

37. Sometime after deviating from the flagged route, Mr. Smith and his companions reached an area where the downward slope of the ground was about 10–15 degrees. They crossed an obvious crack in the snow which was solidly filled in. This was a crevasse. Mr. Kaz warned Mr. Smith and Mr. Powell to be careful of such cracks.

38. While walking across the unflagged snow field, Mr. Smith and Mr. Powell dropped into snow above their knees, but this did not cause them to turn back or return to the flagged route.

39. Mr. Smith and his companions did not walk in single file while walking across the snow field.

40. Mr. Smith and his companions did not rope themselves together while walking across the snow field.

41. Mr. Smith and his companions did not encounter any other hikers walking across the snow field. Nor did they see any footprints in the snow.

42. After stopping for a snack, Mr. Kaz took a step and suddenly disappeared from sight.

43. Mr. Smith then took another step and he disappeared from sight.

44. Both Mr. Kaz and Mr. Smith had fallen into a crevasse.

45. Mr. Smith died from exposure and/or internal injuries suffered as a result of the fall.