Ali BOURESLAN, Plaintiff–Appellant,

v.

ARAMCO, Arabian American Oil Company and Aramco Service Company, Defendants–Appellees.

No. 87–2206.

United States Court of Appeals, Fifth Circuit.

Oct. 17, 1988.

James Field Tyson, Perry Archer, Houston, Tex., for plaintiff-appellant.

Charles A. Shanor, Karen MacRae Smith, E.E.O.C., Washington, D.C., for amicus-E.E.O.C.

Edward E. Potter, McGuiness & Williams, Washington, D.C., for amicus E.E.A.C.

John D. Roady, Linda Ottinger Headley, Hutcheson & Grundy, Houston, Tex., for Aramco.

Lawrence Z. Lorber, John E. Parauda, Breed, Abbott & Morgan, Washington, D.C., for amicus-ASPA.

Cecil J. Olmstead, Steptoe & Johnson, Washington, D.C., for amicus-Rule of Law Committee.

Before KING * and DAVIS, Circuit Judges, and PARKER,** District Judge.

**W. EUGENE DAVIS, Circuit Judge:**

Plaintiff, a naturalized citizen of the United States, brought an employment discrimination suit—predicated upon Title VII and state law causes of action—against his employer, a United States corporation whose principal place of business is in Saudi Arabia. In his suit, plaintiff charged that while he was working in Saudi Arabia, his employer discriminated against him on the basis of his race, religion, and national origin. The employer contested plaintiff's claims of discrimination and, in addition, moved the district court to dismiss the entire action. The employer argued that the reach of Title VII does not extend to United States citizens employed abroad by United States employers and, therefore, that the district court lacked subject matter jurisdiction over plaintiff's claim. The district court agreed, granted the employer's motion, and dismissed plaintiff's suit. On appeal, plaintiff—joined by the Equal Employment Opportunity Commission as *amicus curiae*—urges us to conclude, that Congress intended Title VII to apply extraterritorially to protect United States citizens employed by United States employers. We find, however, that the rules of statutory construction which control our review of Title VII do not permit the conclusion plaintiff urges—we cannot say that Congress, through either the language of Title VII or its legislative history, clearly expressed its intent that Title VII be applied extraterritorially. Therefore, we conclude that Title VII does not offer plaintiff an available remedy for his claimed discrimination and affirm the district court.

### I.

This appeal presents a single issue: Does Title VII regulate the employment practices of businesses which, although incorporated in the United States, employ citizens

---

* Formerly Judge Randall.

** District Judge of the Eastern District of Texas, sitting by designation.

of the United States in foreign countries? The question reaches us as a result of the employment relationship between Ali Boureslan, Arabian American Oil Company (Aramco), and Aramco Services Company (ASC). In 1979, Boureslan—a naturalized United States citizen who was born in Lebanon—went to work as an engineer for ASC in Houston, Texas. ASC is a Delaware corporation with its principal place of business in Houston; ASC is a subsidiary of Aramco, licensed to do business in Texas, with its principal place of business in Dhahran, Saudi Arabia. In November 1980, Boureslan requested a transfer to Aramco. Because Aramco explores, produces, and refines oil and gas exclusively within the Kingdom of Saudi Arabia, Boureslan's transfer from ASC to Aramco also meant a transfer from the United States to Saudi Arabia.

Shortly after beginning work in Saudi Arabia, Boureslan began having altercations with his supervisor. According to Boureslan, the altercations were the result of a "campaign of harassment" which the supervisor initiated—a campaign which took the form of racial, religious, and ethnic slurs and which culminated in Boureslan's termination on June 16, 1984.

After he was fired, Boureslan first filed charges against Aramco with the Equal Employment Opportunity Commission (EEOC) in the United States and, later, instituted this suit against both Aramco and ASC in the United States District Court for the Southern District of Texas. In each case, the focus of Boureslan's attack was the discriminatory treatment which he allegedly received while in Saudi Arabia from his Aramco supervisor. In his lawsuit, Boureslan sought relief under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and state law. In response to the lawsuit, both Aramco and ASC filed answers denying liability and separately filed motions to dismiss for lack of subject matter jurisdiction. ASC stressed two reasons why Boureslan's claims against ASC should be dismissed. First, ASC argued that, at most, only Aramco could be liable to Boureslan since, according to ASC, Boureslan's transfer from ASC to Aramco terminated the employment relationship between ASC and Boureslan. Second, ASC argued that Boureslan failed properly to exhaust his administrative remedies under Title VII with respect to ASC because Boureslan named only Aramco in the one grievance he filed with the EEOC.

While ASC's grounds for dismissal challenged only the propriety of its own inclusion in Boureslan's lawsuit, Aramco's motion to dismiss raised a more sweeping challenge—a challenge which, if true, required a dismissal of the lawsuit against both Aramco and ASC. Aramco argued that the protections of Title VII do not extend extraterritorially and, consequently, that Title VII offers no protection to Boureslan for acts of discrimination which occurred in Saudia Arabia. Boureslan contested this interpretation, and argued that the clear and express terms of Title VII demonstrate Congress' intent to protect United States citizens from employment discrimination by American employers regardless of where the discrimination occurs. In an opinion dated January 27, 1987, the district court considered carefully the question of Title VII's geographic reach. After examining Title VII's language and legislative history, Supreme Court cases on extraterritorial application of federal statutes, and other existing case law on the scope of Title VII, the district court concluded that Title VII does not afford extraterritorial protection. *Boureslan v. Aramco*, 653 F.Supp. 629, 631 (S.D. Tex.1987). Consequently, the court dismissed Boureslan's Title VII action against Aramco and ASC for lack of subject matter jurisdiction; it also dismissed Boureslan's state law claims for lack of pendent jurisdiction, and entered final judgment in favor of both defendants. On appeal, Boureslan asks us to find that Congress intended Title VII to be applied extraterritorially.

## II.

A special set of rules of statutory interpretation are in place to assist us in determining whether Congress intended to give

a statute application outside this country. We first examine those rules.

In *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680 (1949), the Supreme Court considered whether a federal statute prohibiting workdays of longer than eight hours without overtime pay applied to a contract between the United States and a private contractor for work performed in a foreign country. *Id.* at 282, 69 S.Ct. at 576. As the Court saw it:

The canon on construction which teaches that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States, is a valid approach whereby unexpressed congressional intent may be ascertained. It is based on the assumption that Congress is primarily concerned with domestic conditions. We find nothing in the Act itself, as amended, nor in the legislative history, which would lead to the belief that Congress entertained any intention other than the normal one in this case.

*Id.* at 285, 69 S.Ct. at 577 (citation omitted). *See also McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21–22, 83 S.Ct. 671, 677–78, 9 L.Ed.2d 547 (1963).

This court has consistently applied the presumption against extraterritoriality. In *United States v. Mitchell*, 553 F.2d 996 (5th Cir.1977), we refused to read extraterritorial application into the Marine Mammal Protection Act. In ruling against extraterritorial application, we noted that "the government [failed] to [show] any clear expression of congressional intent [to overcome the presumption against extraterritorial application]." In *De Yoreo v. Bell Helicopter Textron, Inc.*, 785 F.2d 1282, 1283 (5th Cir.1986), we rejected the argument that the Age Discrimination In Employment Act (ADEA) be given extraterritorial application.

Other circuits have followed the Supreme Court in denying extraterritorial application without a clear congressional expression of intent to the contrary. For example, in *Pfeiffer v. Wm. Wrigley, Jr. Co.*, 755 F.2d 554 (7th Cir.1985), the Seventh Circuit considered the extraterritorial application of the ADEA. After finding that the statute did not speak directly to the issue of extraterritorial application, the court applied the presumption against extraterritorial application, noting that "[t]he fear of outright collisions between domestic and foreign law—collisions both hard on the people caught in the cross-fire and a potential source of friction between the United States and foreign countries—lies behind the presumption against the extraterritorial application of federal statutes." *Id.* at 557. Likewise in *Cleary v. United States Lines, Inc.*, 728 F.2d 607 (3d Cir.1984), the Third Circuit rejected the application of the ADEA extraterritorially without "affirmative evidence of congressional intent." *See also Air Line Stewards and Stewardesses Ass'n Int'l v. Trans World Airlines, Inc.*, 273 F.2d 69, 70 (2d Cir.1959), *cert. denied*, 362 U.S. 988, 80 S.Ct. 1075, 4 L.Ed.2d 1021 (1960) (denying extraterritorial application of the Railway Labor Act (RLA)); *Air Line Stewards and Stewardesses Ass'n Int'l v. Northwest Airlines, Inc.*, 267 F.2d 170, 178 (8th Cir.), *cert. denied*, 361 U.S. 901, 80 S.Ct. 208, 4 L.Ed.2d 156 (1959) (denying extraterritorial application of RLA); *Air Line Dispatchers Ass'n v. National Mediation Bd.*, 189 F.2d 685, 690–91 (D.C.Cir.), *cert. denied*, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951) (denying extraterritorial application of RLA); *see generally* Restatement (Second) of the Foreign Relations Law of the United States § 38 (1965).

Against this backdrop, we examine the language and legislative history of Title VII to determine whether Congress intended the act to have extraterritorial application.

## III.

### A.

Boureslan's discrimination case is based upon § 703(a)(1) of Title VII which provides:

It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any indi-

vidual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1).

Extraterritorial application is not directly addressed in Title VII. Section 2000e(b) defines "employer" under the Act as including any "person employed in an industry affecting commerce." The term "commerce" is in turn defined as "trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof." 42 U.S.C. § 2000e(g).

 Boureslan, however, relies on § 2000e–1 commonly referred to as the alien exemption provision, which provides that "[t]his title shall not apply to an employer with respect to employment of aliens outside of any state."[1] Boureslan argues that a "negative inference" should be drawn from this language that Congress intended Title VII to cover United States citizens working abroad for United States employers. Boureslan argues that the alien exemption provision has no purpose if Title VII is not applied to protect citizens extraterritorially because in the absence of this provision neither citizens nor aliens would be protected while working outside the country. Boureslan notes that one district court has accepted this argument. *Bryant v. International School Servs.*, 502 F.Supp. 472 (D.N.J.1980), *rev'd on other grounds*, 675 F.2d 562 (3d Cir. 1982).

But the alien exemption provision does have a purpose even if we accept the district court's conclusion that Title VII does not protect citizens abroad. First, no one disputes that the provision excludes coverage to aliens employed outside the states. Second, in *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95, 94 S.Ct. 334, 340, 38 L.Ed.2d 287 (1973), the Supreme Court attached another meaning to the provision's domestic scope. The Court concluded that the alien exemption provision reflects a congressional intent to provide Title VII coverage to aliens employed *within* the United States.

Thus, we do not face a choice between attaching appellant's negative inference to the alien exemption provision or stripping the provision of all purpose. If we decline to give the alien exemption provision the interpretation appellant seeks, the provision still is a meaningful and useful part of the Act. Appellant has not persuaded us that the provision's language merits an interpretation that overcomes the presumption against extraterritorial application of the Act.

Boureslan argues next that the legislative history of Title VII, when coupled with the statutory language, evidences a clear congressional intent to apply the Act extraterritorially. It is to the legislative history, therefore, that we must now turn.

### B.

 Before considering the particular portions of the legislative history pointed to by Boureslan, it is important that we define the role allocated to legislative history in statutory interpretation. Legislative history is relegated to a secondary source behind the language of the statute in determining congressional intent; even in its secondary role legislative history must be used "cautiously." *United States v. Smith*, 795 F.2d 841 (9th Cir.1986). Courts are not free to substitute legislative history for the language of the Act and legislative history is not an adequate substitute for

---

**1.** Eight years after the enactment of Title VII, Congress added the following language to extend protection of the Act to federal employees, and included the alien exemption language:

All personnel actions affecting employees or applicants for employment (*except with regard to aliens employed outside the limits of the United States*) in military departments ..., in executive agencies ..., in the United States Postal Service and the Postal Rate Com-

mission, in those units of the government of the District of Columbia having positions in the competitive service, and in those units of the legislative and judicial branches of the Federal Government having positions in the competitive service, and in the Library of Congress shall be made free from any discrimination based on race, color, religion, sex, or national origin. (emphasis added).

42 U.S.C. § 2000e–16(a).

congressional action. *Piper v. Chris–Craft Indus., Inc.*, 430 U.S. 1, 97 S.Ct. 926, 5 L.Ed.2d 124 (1977); *United States v. Devall*, 704 F.2d 1513 (11th Cir.1983); *Aronsen v. Crown Zellerbach*, 662 F.2d 584 (9th Cir.1981), *cert. denied*, 459 U.S. 1200, 103 S.Ct. 1183, 75 L.Ed.2d 431 (1983). The Supreme Court has repeatedly stated that " '[a]bsent a clearly expressed legislative intention to the contrary, [statutory] language must ordinarily be regarded as conclusive.' " *Escondido Mut. Water Co. v. La Jolla Indians*, 466 U.S. 765, 772, 104 S.Ct. 2105, 2110, 80 L.Ed.2d 753 (1984) (quoting *North Dakota v. United States*, 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983); *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980).

■ The EEOC in its amicus curiae brief points to three statements in the legislative history that, it argues, supports its interpretation of the Act. First, the EEOC notes that in the House report that accompanied the Act to the Senate floor, the passage of Title VII was declared necessary:

> [t]o remove obstructions to the free flow of interstate and foreign commerce and to insure the complete and full enjoyment by all persons of the rights, privileges, and immunities secured and protected by the Constitution.

House Report on Civil Rights Act of 1964, H.R.Rep. No. 914, 88th Cong., 1st Sess. (1963), reported in 1964 U.S.Code Cong. & Admin.News 2391, 2402. Second, EEOC stresses a comment by Representative William McCulloch, ranking minority member of the House Judiciary Committee, in which McCulloch stated that "[a] key purpose of the bill, then, is to secure to all Americans the equal protection of the laws of the United States and of the several states." *Id.*, reprinted in 1964 U.S.Cong. Code &

Admin.News at 2488. EEOC also points out that the minority report states that "[t]he rights of citizenship mean little if an individual is unable to gain the economic wherewithall to enjoy or properly use them." *Id.* at 2516. The EEOC argues that these general policy statements reflect a strong intent by Congress to combat employment discrimination on all fronts without any geographic limits. Thus, the EEOC asserts that the omission of any mention of extraterritorial application supports, rather than detracts, from their position.[2]

■ These references to Title VII's legislative history fall far short of the clear expression of congressional intent required to overcome the presumption against extraterritorial application. The statements, carefully taken from a voluminous legislative history, are no more specific than the statutory language itself. To rely on such general policy statements would effectively adopt a presumption in favor of extraterritorial application. This is particularly true when the legislative history contains numerous statements that arguably favor geographic limits for Title VII.

For example, the Act's language and legislative history make repeated references to the "United States," "states," and procedures relating to state proceedings without parallel references to foreign countries. 42 U.S.C. 2000e(i) defines "state" to include the states and other areas under United States jurisdiction, with no reference to foreign countries. References in the legislative history highlight concerns about employment discrimination problems in the states, Senator Hubert Humphrey, 110 Cong.Rec. 6550 (1964); the effect of Title VII on southern states versus other states, Senator Richard Russell, 110 Cong.Rec. 14301 (1964); and deferral to state employment laws, Congressman Emanuel Celler, 110 Cong.Rec. 1521 (1964).

---

**2.** In *Espinoza*, 414 U.S. at 94, 94 S.Ct. at 339, the Court noted that the EEOC's interpretation of Title VII is generally entitled to deference. However, such interpretations are not controlling on the courts. Because this is a jurisdictional issue with little or no statutory language or legislative history, and one in which the EEOC has developed no particular expertise, we give the EEOC's interpretation less deference than usual. This is particularly appropriate given the traditional presumption against extraterritoriality. *See General Electric Co. v. Gilbert*, 429 U.S. 125, 141–42, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

Moreover, Congress deleted reference to "foreign commerce" and "foreign nations" from earlier House versions of Title VII.[3] While these references and deletions are not conclusive legislative support, they are certainly as persuasive as policy statements in the legislative history offered by the EEOC.

EEOC also points to a reference to the alien exemption provision contained in a house report rendered in connection with H.R. 405, a concurrent attempt to fashion equal employment legislation during the 88th Congress' first session in 1963. This report was placed in the record in the hearings for H.R. 7152, which ultimately became the Civil Rights Act of 1963. The report stated,

> In section 4 of the Act, limited exception is provided for employers with respect to employment of aliens outside of any state, and also, to any religious corporations, associations, or societies. The intent of the first exemption is to remove conflicts of law which might otherwise exist between the United States and a foreign nation in the employment of aliens outside the United States by an American enterprise.

*Civil Rights: Hearings on H.R. 7152, as amended by Subcommittee No. 5 before the House Committee on the Judiciary,* 88th Cong., 1st Sess. 2303 (1963). EEOC urges us to interpret this language to reflect an intent that, but for the alien exemption provision, Title VII protects all persons employed overseas by American employers.

However, this brief reference sheds little additional light on the issue. Whether it points to the provision's bare language or to this snippet of legislative history, EEOC still must argue a negative inference. That is, EEOC argues that Congress spoke by not speaking. This silence will not reverse the presumption that this legislation applies only to employees employed in the United States.[4]

■ Finally, Boureslan and the EEOC advance a number of policy arguments in favor of the extraterritorial application of Title VII. These arguments go to the inequity of denying Americans employed abroad protections to which they are entitled in the United States. Although these arguments have obvious appeal, we cannot ignore strong countervailing policy arguments against the application of Title VII abroad. The religious and social customs practiced in many countries are wholly at odds with those of this country. Requiring American employers to comply with Title VII in such a country could well leave American corporations the difficult choice of either refusing to employ United States citizens in the country or discontinuing business. Given the serious, potentially devisive policy considerations for and against application of the Act outside the country, the paucity of reference to such an application either in the Act itself or the debates in Congress is a compelling argument that Congress did not turn its attention to this possibility. It is not for this court to decide this policy issue for the legislative branch.

> While the judicial function in construing legislation is not a mechanical process from which judgment is excluded, it is nevertheless very different from the legislative function. Construction is not

---

3. These deletions are reflected in an annotated copy of the House bill that Senator Dirksen inserted into the Congressional Record on June 5, 1964, in anticipation of debate on the Senate's substitute bill. Senator Everett Dirksen, 110 Cong.Rec. 12811–817 (1964).

4. The colloborative nature of the way in which H.R. 405 found its way into H.R. 7152 further dilutes the report's impact. The General Subcommittee on Labor voted on June 20, 1963, to report H.R. 405 to the full Committee on Education and Labor. On July 31, 1963, Subcommittee No. 5 of the House Committee on the Judiciary placed this report in the record of hearings on H.R. 7152, the administration's civil rights bill. Subcommittee No. 5 substituted H.R. 405 for the equal employment title originally proposed in H.R. 7152, and reported H.R. 7152 favorably to the full judiciary committee. The full committee retained the alien exemption provision when it reported the title on Nov. 20, 1963. Ultimately, Congress enacted H.R. 7152 as the Civil Rights Act of 1963. In short, EEOC looks for a clear expression of intention in a negative inference arising from one paragraph of a report rendered by members of a House subcommittee that did not participate in voting the bill out of the Judiciary Committee and sending it to the full House.

legislation and must avoid "that retrospective expansion of meaning which properly deserves the stigma of judicial legislation." To blur the distinctive functions of the legislative and the judicial processes is not conductive to responsible legislation.

*Addison v. Holly Hill Fruit Prods. Co.,* 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944) (citation omitted).

### IV.

The presumption against extraterritorial application establishes a high hurdle for appellant's arguments to overcome. Neither the statute's bare language nor the sparce indirect language on the subject in the legislative history persuade us that he has cleared this hurdle.

AFFIRMED.

KING, Circuit Judge, dissenting:

Today, in the first circuit court opinion to consider expressly the extraterritorial application of Title VII,[1] the majority holds that Title VII affords no protection from employment discrimination to U.S. citizens who are employed abroad by U.S. corporations. Because an examination of the language and legislative history of Title VII reveals that Congress did not intend the protections of Title VII to be so restricted, and because the extraterritorial application of Title VII to U.S. nationals would not violate principles of international law, I must respectfully dissent from the majority's holding.

### I. The Presumption Against Extraterritoriality

It is undisputed that Congress had the power to extend Title VII's protections extraterritorially. *See Steele v. Bulova Watch Co.,* 344 U.S. 280, 282–83, 73 S.Ct. 252, 253–54, 97 L.Ed. 319 (1952); *Foley Bros. v. Filardo,* 336 U.S. 281, 284, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949); *United States v. Mitchell,* 553 F.2d 996, 1001 (5th Cir.1977). Nationality is an accepted basis for the exercise of jurisdiction. Thus, a state may prescribe law relating to the conduct of its nationals, even when that conduct occurs outside of the state's territory. *See Steele,* 344 U.S. at 285–86, 73 S.Ct. at 255–56; *Blackmer v. United States,* 284 U.S. 421, 436–37, 52 S.Ct. 252, 254–55, 76 L.Ed. 375 (1932); *Mitchell,* 553 F.2d at 1001; *Laker Airways v. Sabena, Belgian World Airlines,* 731 F.2d 909, 922 (D.C.Cir.1984); Restatement (Third) of the Foreign Relations Law of the United States § 402 (1987) [hereinafter Restatement]. The only question in this case is whether Congress exercised that power.

The majority correctly notes that because jurisdiction to prescribe is ordinarily exercised on the basis of territory rather than nationality,[2] there is a presumption that Congress intends legislation to apply only within the territorial jurisdiction of the United States, unless a contrary intent appears. *Steele,* 344 U.S. at 285, 73 S.Ct. at 255; *Foley Bros.,* 336 U.S. at 285, 69 S.Ct. at 577–78; *Blackmer,* 284 U.S. at 437, 52 S.Ct. at 254–55; *Mitchell,* 553 F.2d at 1002. The majority goes astray, however, in its determination of what constitutes an expression of "contrary intent" sufficient to overcome the presumption.

As will be demonstrated more fully below, this is not a case in which the claim of extraterritorial jurisdiction is based solely

---

**1.** Every district court that has considered the question has held that Title VII does apply extraterritorially. *Bryant v. International Schools Services, Inc.,* 502 F.Supp. 472 (D.N.J.1980), *rev'd on other grounds,* 675 F.2d 562, 577 n. 23 (3d Cir.1982) (declining to reach question of Title VII's extraterritorial application); *Seville v. Martin Marietta Corp.,* 638 F.Supp. 590 (D.Md. 1986) (adopting *Bryant's* reasoning); *Love v. Pullman,* 13 Fair Empl.Prac.Cas. (BNA) 423, 426 n. 4 (D.Colo.1976), *aff'd on other grounds,* 569 F.2d 1074 (10th Cir.1978); *see also Kern v. Dynaelectron,* 577 F.Supp. 1196 (N.D.Tex.1983) (ap-

plying Title VII extraterritorially without expressly considering threshold jurisdictional issue), *aff'd mem.,* 746 F.2d 810 (5th Cir.1984).

**2.** Territory and nationality are the two universally recognized bases for a state's exercise of jurisdiction to prescribe law. Restatement § 402 comment a (also noting that these links may not be sufficient in all cases). Territoriality, however, "is considered the normal, and nationality an exceptional, basis for the exercise of jurisdiction." *Id.* comment b.

on the broad jurisdictional language of the statute. Rather, the conclusion that Title VII was intended to apply to U.S. citizens employed abroad by U.S. corporations is compelled by canons of statutory construction and is further supported by legislative history. In rejecting these traditional methods of statutory interpretation as inadequate, the majority implies that nothing short of an explicit statement by Congress will overcome the presumption.

The classic formulation of the presumption, however, does not impose such a stringent standard: "The canon of construction which teaches that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States ... is a valid approach whereby *unexpressed* congressional intent may be ascertained." *Foley Bros.*, 336 U.S. at 285, 69 S.Ct. at 577 (emphasis added) (citation omitted); *Natural Resources Defense Council v. Nuclear Regulatory Comm'n*, 647 F.2d 1345, 1357 n. 54 (D.C.Cir.1981). The most established method of ascertaining unexpressed congressional intent is to apply principles of statutory construction, and to refer to the legislative history of the act. *See* N. Singer, 2A Sutherland Statutory Construction §§ 45.12, 48.06 (1984). Nothing in this formulation indicates that a "contrary intent" sufficient to overcome the presumption

against extraterritoriality may not be determined according to these ordinary methods.

Even if we add the adjective "clear" to our formulation of the presumption, *Mitchell*, 553 F.2d at 1002,[3] "clear" does not mean "express," and there is no reason why a "clear" intent to apply a statute extraterritorially may not be determined with reference to the rules of statutory construction, informed by legislative history. At most, requiring a "clear" expression of congressional intent may mean that the broad jurisdictional language of a statute is not sufficient in itself to support the exercise of extraterritorial jurisdiction. *See Mitchell*, 553 F.2d at 1003–04. It should be noted, however, that the Supreme Court *has* found such language sufficient to overcome the presumption.[4]

The extremely strong showing of congressional intent which the majority requires is clearly not compelled by the presumption itself. Rather, it appears that the majority has distorted the presumption in an effort to transform it into something it is not: a mechanism for evaluating potential conflicts of jurisdiction.[5] The majority concludes in effect that the policy implications of applying Title VII extraterritorially are so serious that we must require a more explicit statement by Con-

---

**3.** Though *Mitchell* cites *Steele* and *Foley Bros.* as support for its formulation of the presumption, neither case requires that Congress' expression of "contrary intent" be "clear." 553 F.2d at 1002 (citing *Steele*, 344 U.S. at 285, 73 S.Ct. at 255, *Foley Bros.*, 336 U.S. at 285, 69 S.Ct. 577–78). For the purposes of this case, however, I recognize that we are bound by *Mitchell's* interpretation of these cases.

**4.** In *Foley Bros.*, the Supreme Court held that such language was not sufficient to support extraterritorial jurisdiction. 336 U.S. at 287, 69 S.Ct. at 578–79. However, in *Steele*, decided three years later, the Court found that the broad jurisdictional language of the Lanham Act was sufficient to support the exercise of extraterritorial jurisdiction over U.S. nationals abroad. 344 U.S. at 286–87, 73 S.Ct. at 255–56.

In *Mitchell*, this court rejected the government's argument that use of the term "moratorium" in the Marine Mammal Protection Act, without reference to the geographic scope of the

provision, indicated an intent by Congress to extend the moratorium against the taking of marine mammals world wide. 553 F.2d at 1003. Citing *Foley Bros.*, the court reasoned that such "all inclusive language" was not sufficient, by itself, to support extraterritorial jurisdiction. *Id.* at 1003–04.

**5.** Quoting from *Pfeiffer v. Wm. Wrigley, Jr. Co.*, 755 F.2d 554 (7th Cir.1985), the majority maintains that the presumption arises from "[t]he fear of outright collisions between domestic and foreign law—collisions both hard on those caught in the cross-fire, and a potential source of friction between the United States and foreign countries."

It is true that by requiring a threshold showing of congressional intent, the presumption will in practice prevent unnecessary conflicts of law. Once that threshold showing has been established, however, we must turn to other mechanisms for resolving the conflicts of law that inevitably arise from the exercise of extraterritorial jurisdiction.

gress that it intended Title VII to apply so broadly.

The majority's conclusion might be appropriate if Congress was, as the majority claims, silent on this subject. But Congress was not silent on the subject. Rather, we have evidence that Congress did consider the implications of applying Title VII extraterritorially: Congress included in the statute a provision explicitly exempting aliens employed abroad by U.S. corporations *in order to avoid conflicts of law*. It follows logically that Congress believed that application of Title VII to U.S. citizens employed abroad by U.S. corporations would not present similar barriers to the exercise of extraterritorial jurisdiction.[6] In concluding that the statute should not apply to U.S. citizens employed abroad, the majority has therefore done precisely what it cautions against: It has substituted its own policy judgment for that of Congress.

The majority's intuition is correct that the implications of applying a statute extraterritorially *may* be such that the type of evidence presented in this case would not be sufficient to support the exercise of extraterritorial jurisdiction. For example, a greater showing of congressional intent would be required to support an exercise of extraterritorial jurisdiction that would violate international law. A statute may not be construed to violate international law

unless Congress has, by an affirmative expression of its intent, required that construction. *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21–22, 83 S.Ct. 671, 677–78, 9 L.Ed.2d 547 (1963); *Weinberger v. Rossi*, 456 U.S. 25, 32, 102 S.Ct. 1510, 1515–16, 71 L.Ed.2d 715 (1982); *see also* Restatement § 114.[7]

This principle is a facet of the separate presumption that Congress does not intend to violate international law. *See* Restatement § 115 comment a ("It is generally assumed that Congress does not intend to repudiate an international obligation of the United States by nullifying a rule of international law or an international agreement as domestic law.").

The showing of congressional intent required to overcome the presumption that Congress does not intend to violate international law is much greater than that required to overcome the presumption against extraterritoriality. While the two presumptions are in some respects parallel, they should not be conflated because not every exercise of extraterritorial jurisdiction violates international law. A separate, more stringent standard is properly reserved for cases in which the exercise of jurisdiction, extraterritorial or otherwise, would violate international law.

By requiring a more explicit showing of congressional intent to apply Title VII ex-

---

6. This argument is advanced in more detail below.

7. Although the majority cites *McCulloch* in its discussion of the presumption against extraterritoriality, *McCulloch* did not turn on the issue of extraterritorial jurisdiction. Indeed, the presumption against extraterritoriality is not even mentioned in the opinion. Rather, the Supreme Court in *McCulloch* found that application of the National Labor Relations Act to protect foreign seamen, employed on vessels registered under a foreign flag, would violate State Department policy, a Treaty with the Honduran government, and the established principle of international law that the internal affairs of a vessel are to be regulated according to "the law of the flag state." *Id.*, 372 U.S. at 20–21 & n. 12, 83 S.Ct. 677 n. 12. The Court held that absent "[t]he affirmative intention of Congress clearly expressed," the NLRA could not be construed to apply to foreign seamen employed aboard vessels registered under a foreign flag because such

a construction would violate the law of nations. *Id.* at 21–22, 83 S.Ct. at 677–78.

The standard set forth in *McCulloch* is thus not an elaboration upon the presumption against extraterritoriality, but an application of the long-standing principle that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Id., quoting The Charming Betsy*, 2 Cranch 64, 118, 2 L.Ed. 208 (1804)); *accord* Restatement section 114; *see also Rossi*, 456 U.S. at 32, 102 S.Ct. at 1515–16 (citing *McCulloch* for this proposition, and construing statute to avoid repudiation of several international agreements, absent affirmative expression of Congress requiring that construction).

*McCulloch*, therefore, stands for the proposition for which it is cited in the text: a statute may not be construed to violate international law unless Congress has, by an affirmative expression of its intent, required that construction. 372 U.S. at 21–22, 83 S.Ct. at 677–78; *Rossi*, 456 U.S. at 32, 102 S.Ct. at 1515–16.

traterritorially—without discussing whether extraterritorial application of Title VII would violate international law—the majority has implicitly conflated the two standards and has therefore defeated congressional intent without sufficient justification.

While I agree with the majority that we must consider the foreign policy implications of construing a statute to apply extraterritorially, I do not believe that its approach to these issues is satisfactory. We should not defeat congressional intent to exercise extraterritorial jurisdiction without engaging in a more principled analysis of the implications of applying the statute extraterritorially.[8]

In order to evaluate the complex issues raised in this case, we need a finer set of analytic tools than those employed in the majority opinion. I therefore propose an alternative framework that will, I believe, provide a more satisfactory treatment of the issues in this case.

The starting point for our analysis in this case should be section 403 of the Restatement which provides that as a matter of international law "a state may not exercise jurisdiction to prescribe law with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable." § 403(1). The factors enumerated in the Restatement provide a framework within which we can evaluate in a principled fashion the implications of applying Title VII extraterritorially.[9] *See American Rice, Inc. v. Arkansas Rice Growers Cooperative Ass'n,* 701 F.2d 408 (5th Cir.1983) (applying elements sim-

ilar to reasonableness test to determine whether exercise of extraterritorial jurisdiction under Lanham Act was appropriate).

Moreover, because section 403 is a principle of international law, a statute may not be construed to violate the principle absent an explicit, affirmative expression of congressional intent compelling that construction. *See McCulloch,* 372 U.S. at 21–22, 83 S.Ct. at 677–78; *Rossi,* 456 U.S. at 32, 102 S.Ct. at 1515–16; Restatement § 403 comment g. Thus, a statute will not be applied extraterritorially where it would be unreasonable to do so, unless Congress has affirmatively required that it be so applied. If extraterritorial application of Title VII would be unreasonable, the majority's conclusion would be correct—because Congress has not *affirmatively* required that the statute be applied extraterritorially.

If, however, extraterritorial application of the statute would not be unreasonable, and therefore would not violate international law, the threshold level of congressional intent required to overcome the presumption against extraterritoriality will be sufficient to support the exercise of extraterritorial jurisdiction. As explained above, no express statement of Congress is required to overcome the presumption. *See Foley Bros.,* 336 U.S. at 285, 69 S.Ct. at 577–78. Rather, we may employ traditional methods of statutory interpretation to determine whether the language and legislative history of Title VII evidence a clear intent that the statute be applied extraterritorially.

---

8. In suggesting that we evaluate these concerns, I do not propose that we overstep our judicial role by intruding on the realm of international affairs which is properly the province of the legislative and executive branches. I propose simply that if the evidence of congressional intent to apply Title VII extraterritorially is sufficient to overcome the (properly applied) presumption against extraterritoriality, we should give effect to that intent unless we are precluded by principles of international law from doing so. This undertaking is entirely consistent with our judicial role. *See* Restatement § 111(1)-(2) (International law is the law of the United States and within the judicial power of the United States.).

9. The Supreme Court's language in *Steele* suggests such a two-pronged inquiry: "the United States is not debarred by any rule of international law from governing the conduct of its own citizens upon the high seas or even in foreign countries when the rights of other nations or their nationals are not infringed." 344 U.S. at 286, 73 S.Ct. at 255–56. Thus, if the rights of other nations or their nationals are not infringed, an act of Congress may be given the full geographic scope that Congress intended. The reasonableness inquiry is a means by which we can determine whether foreign rights or interests would be infringed such that extraterritorial application of a statute would be inappropriate.

This analysis will insure that we accord proper respect both to the sovereignty of other nations and to Congress' intent.

## II. The "Jurisdictional Rule of Reason."

The showing of congressional intent necessary to support an exercise of extraterritorial jurisdiction depends in the first instance on whether that exercise of jurisdiction will violate international law. Before examining the language and legislative history of Title VII, I will therefore consider whether extraterritorial application of Title VII would violate the principle of international law set forth in section 403 of the Restatement: "[A] state may not exercise jurisdiction to prescribe law with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable." [10] Restatement § 403(1). Although the majority does not address this issue in its opinion, ARAMCO and Amicus Curiae assert that extraterritorial application of Title VII would violate the "reasonableness" principle. ARAMCO's arguments are addressed in the discussion below.

It should be noted at the outset of this discussion that section 403 is couched in general terms; it does not purport to eliminate all conflicts in the exercise of jurisdiction. *See* Restatement § 403 comment d ("Exercise of jurisdiction by more than one state may be reasonable—for example, when one state exercises jurisdiction on the basis of territory and the other on the basis of nationality."). Therefore, the possibility that a conflict with foreign law may arise in some case does not render Congress' initial exercise of extraterritorial jurisdiction unreasonable. "Because Congress ...

can neither anticipate nor resolve all conflicts with foreign prescriptive jurisdiction," it necessarily relies on the Judiciary to minimize conflicts of jurisdiction by exercising a jurisdictional rule of reason in individual cases. *Laker Airways*, 731 F.2d at 952 n. 169 (citing *Extraterritoriality and Conflicts of Jurisdiction*, U.S. Department of State Current Policy Bulletin No. 481 at 4 (15 April 1983)). Our inquiry here is therefore whether it would in general be reasonable to apply Title VII extraterritorially, not whether it would in all cases be reasonable.

Section 403(2) provides:

Whether exercise of jurisdiction over a person or activity is unreasonable is determined by evaluating all relevant factors, including, where appropriate:

 (a) the link of the activity to the territory of the regulating state, *i.e.*, the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;

 (b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;

 (c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;

---

**10.** Most courts have applied the "reasonableness" principle to consider whether it would be appropriate to moderate their own enforcement of a statute that has already been held to apply extraterritorially. *See, e.g., American Rice, Inc. v. Arkansas Rice Growers Cooperative Association,* 701 F.2d 408 (5th Cir.1983) (Lanham Act); *Laker Airways v. Sabena, Belgian World Airlines,* 731 F.2d 909 (D.C.Cir.1984) (Sherman Act). This was the approach endorsed by section 40 of the Second Restatement, the precursor of section 403.

 The Third Restatement, however, asserts that section 403 is intended to be more than a princi-

ple of comity: "reasonableness is understood here ... as an essential element in determining whether, as a matter of law, the state may exercise jurisdiction to prescribe." Restatement sec. 403 reporters' note 10.

 No court has applied the reasonableness test as part of the threshold inquiry to determine whether a statute may, as a general matter, be applied extraterritorially. The Restatement, however, notes that the reasonableness test may serve the same purpose as the traditional tests for deciding whether a statute may be applied extraterritorially. *Id.* reporters' note 2.

(d) the existence of justified expectations that might be protected or hurt by the regulation;

(e) the importance of the regulation to the international political, legal, or economic system;

(f) the extent to which the regulation is consistent with the traditions of the international system;

(g) the extent to which another state may have an interest in regulating the activity; and

(h) the likelihood of conflict with regulation by another state.

The arguments that extraterritorial application of Title VII would be unreasonable fall into two categories encompassing the factors listed above: First, since discrimination against U.S. citizens that occurs abroad has no domestic effects, U.S. interests are not sufficient to justify the exercise of extraterritorial jurisdiction. Second, because labor relations are a peculiarly domestic matter, it would be an affront to the sovereignty of other nations to apply Title VII extraterritorially.

The first contention mischaracterizes the purpose of Title VII and trivializes the special nature of civil rights laws. The "effects" factor included in the Restatement is well-suited for economic regulation, but not for individual rights of the sort guaranteed by Title VII. It is true that the purposes of Title VII were framed in part in economic

terms,[11] but the 1964 Civil Rights Act, of which Title VII is a part, was also an effort to fulfill the long-postponed promise of equal rights embodied in the fourteenth amendment:[12] It was intended not only to remedy domestic economic ills, but to protect individuals from "the injustices and humiliations" of discrimination. H.R.Rep. No. 914, 88th Cong., 1st Sess. 2018 (1963).

In calling for passage of the civil rights legislation that became the Civil Rights Act of 1964, President Kennedy stated: "In this year of the emancipation centennial, justice requires us to insure the blessings of liberty for all Americans and their posterity—*not merely for reasons of economic efficiency, world diplomacy, and domestic tranquility—but, above all, because it is right.*" Special Message to Congress by the President June 19, 1963 in 109 Cong. Rec. 1055, 1063 (emphasis added).

Because they create individual rights, civil rights laws, unlike economic regulations, fall within the category of "protection of persons." *See* 2 Restatement introductory note to part VII at 150–51.[13] The personal injuries caused by employment discrimination cannot readily be characterized in terms of their "effects" on the forum state. Civil rights are in this respect similar to constitutional guarantees of individual rights which control the exercise of governmental authority over U.S. citizens outside the territory of the United

---

**11.** The language regarding the economic effects of discrimination provides a basis for Congress' exercise of power under the Commerce Clause. *See Heart of Atlanta Motel v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (upholding Title II of the Civil Rights Act of 1964 as exercise of Congress' power under the Commerce Clause).

**12.** This purpose is evident from the introductory language to the section which states that Title VII is necessary "[t]o remove obstructions to the free flow of commerce among the States and with foreign nations" and *"[t]o insure the complete and full enjoyment by all persons of the rights, privileges, and immunities secured and protected by the Constitution."* H.R.Rep. No. 914, 88th Cong., 1st Sess. 2009 (1963) (emphasis added).

The fact that it was upheld as an exercise of Congress' power under the Commerce Clause,

does not eclipse the fact that one purpose of the Civil Rights Act was to insure the protection of rights under the fourteenth amendment. *See Heart of Atlanta Motel,* 379 U.S. at 250, 85 S.Ct. at 354 (declining to decide whether Congress' power under the Enforcement Clause of the fourteenth amendment would be sufficient by itself to support enactment of Title II of the Act (public accommodations)); *cf. id.* at 284, 85 S.Ct. at 371–72, (Douglas, J., concurring) (While "economic aspects of the problems of discrimination are heavily accented[,] . . . the objectives of the Fourteenth Amendment were by no means ignored.").

**13.** Indeed, in the same section, the Restatement notes without criticism that "[s]ome United States civil rights legislation protects United States nationals *outside the United States.*" Restatement § 721 reporters' note 13 (citing *Bryant,* 502 F.Supp. 472 (D.N.J.1980) (applying Title VII extraterritorially)).

States—without reference to the domestic "effects" of violating the Constitution. *Id.* § 721 reporters' note 2. While regulation of the conduct of private employers under Title VII is obviously different from the regulation of state actors under the Constitution,[14] my point here is simply that the rights protected by Title VII are, like constitutional rights, personal. *See id.* comment b. It may therefore be inappropriate[15] to evaluate the violation of civil rights in terms of "effects" on the regulating state, even though the extraterritorial application of civil rights laws may be limited by other considerations not applicable to constitutional rights.

If we were to apply the "effects" standard, however, Congress and the courts have long recognized that apart from the personal injuries of discrimination, the cumulative effects of discrimination are pervasive.[16]

Depriving U.S. citizens of a remedy for discrimination experienced while employed abroad by U.S. companies will almost certainly have some effect in the United States. Title VII provides employees with an avenue to vindicate themselves in the event of an unjust firing, a poor reference, or sudden resignation that is in reality the result of discrimination. Today's decision means that one U.S. citizen assigned to the Saudi office of a U.S. corporation, and another U.S. citizen working for the same company in Texas could experience identical acts of discrimination, but only the latter will have a remedy. This situation creates a dilemma for minorities and women: foreign assignments will be less attractive, while refusal of such an assignment could limit an individual's opportunity for advancement. As the EEOC notes, assignment to a foreign office is frequently a required step on the corporate ladder. Extraterritorial application of Title VII may therefore be necessary to ensure that members of protected groups have equal opportunities with respect to foreign assignments that would affect their employment opportunities in the United States. Extraterritorial application of Title VII would also protect the "justified expectations" of U.S. citizens that they will not lose all protection from discrimination by their employers simply because they have been assigned to a foreign office. Restatement § 403(2)(d).

The territorial connections to the regulating state are in any event buttressed by the fact that both "the person principally responsible for the activity to be regulated" and "those whom the regulation is designed to protect" are in this case U.S. nationals—U.S. corporations[17] and their employees who are U.S. citizens. Restatement § 403(2)(b).

It is also incorrect to characterize Title VII's purposes as purely domestic. The legislative history of Title VII reveals that one purpose of the statute was to improve the image of the United States in the international community at a time when this

**14.** Actions by the State, even outside the territory of the United States, must be constrained by the Constitution because the "United States is entirely a creature of the Constitution." *Reid v. Covert,* 354 U.S. 1, 5–6, 77 S.Ct. 1222, 1224–25, 1 L.Ed.2d 1148 (1956) (plurality opinion of Black, J.).

**15.** The Restatement provides that each of the enumerated factors should be evaluated "where appropriate." Restatement § 403(2).

**16.** The same "effects" on commerce which allow Congress to regulate the conduct of private employers under Title VII, *supra* note 11, may be sufficient to establish "effects" in the regulating state within the meaning of section 403. *Cf. Timberlane Lumber Co. v. Bank of America,* 549 F.2d 597, 612 (9th Cir.1976) (noting that Congress' power to regulate foreign commerce is not subject to same restrictions as power to regulate interstate commerce, and effects test for extraterritorial jurisdiction must therefore be informed by "notions of comity and fairness").

Because section 403 requires us to consider other factors in exercising extraterritorial jurisdiction, there is no reason to discard the analysis, already accepted by the courts, that the cumulative economic effects of discrimination are sufficient to justify regulation. *See* L. Tribe, American Constitutional Law 310 (1988) (discussing "cumulative effect" principle as constitutional justification for civil rights legislation).

**17.** "Regulating the activities of businesses incorporated within a state is one of the oldest and most established examples of prescriptive jurisdiction." *Laker Airways,* 731 F.2d at 926.

nation's failure to address discrimination—particularly racial discrimination—had become a source of international criticism and domestic embarassment. H.R.Rep. No. 1370, 87th Cong., 2d Sess. 2156 (1962) (report on Equal Employment Opportunity Act—a forerunner of H.R. 405 which was incorporated into Title VII of H.R. 7152; H.R. 7152 became the Civil Rights Act of 1964) ("continued employment discrimination in the United States casts doubt upon our sincerity in furthering the cause of individual liberty and human dignity"); *See also* Special Message to Congress by the President *supra* at 1055 (legislative inaction on civil rights would result in "weakening the respect with which the rest of the world regards us"). In light of these concerns, the majority's holding today is particularly ironic: U.S. corporations will be allowed to discriminate against U.S. citizens in their foreign offices where their actions will be more immediately visible to other states.

Finally, the international community has adopted a number of conventions calling for an end to discrimination—against many of the groups protected by Title VII.[18] The international consensus condemning discrimination extends to discrimination in employment. Note, *Equal Employment Opportunity for Americans Abroad*, 62 N.Y. U. L.Rev. 1288, 1298 & nn. 66–69 (1987) (international treaties and agreements as well as the proposed Draft Code of Conduct on Transnational Corporations prohibit discrimination in hiring, pay, and promotions). Since Title VII expands on antidiscrimination principles that have been the subject of international concern, there can be no doubt that the desirability of the regulation is generally accepted, and that the regulation is important to the international community and consistent with the traditions of the international system. Restatement § 403(2)(c), (e) & (f).

The United States' interest in enforcing the civil rights of its citizens against violations by U.S. corporations is therefore not only sufficiently strong to support the exercise of extraterritorial jurisdiction, but also is consistent with the interests of the international community in eradicating discrimination. Congressional intent to apply Title VII extraterritorially should therefore be defeated only if such application would be an affront to the sovereignty of other nations.

ARAMCO and Amicus Curiae argue that labor laws are of particularly local concern, and that most states apply their own labor laws on a territorial basis. They therefore conclude that extraterritorial application of Title VII would offend other nations and produce inevitable conflicts of law—a contention echoed in the majority opinion.

As noted above, section 403 does not purport to eliminate concurrent jurisdiction. There is no principle of international law which "separates jurisdiction to prescribe into neatly adjoining compartments of national jurisdiction." *Laker Airways*, 731 F.2d at 952.

ARAMCO essentially urges that the untidiness of concurrent jurisdiction may be avoided by applying the reasonableness inquiry to preclude the extraterritorial application of a statute wherever it is possible that another state would exercise jurisdiction over the same activity. This reading, however, also fails to produce a perfectly coherent jurisdictional scheme. Because the reasonableness constraint applies to both the territorial and nationality bases of jurisdiction, the extreme deference to other nations urged by ARAMCO could create a jurisdictional vacuum. We do not know, for example, to what extent a foreign state would enforce its own laws to regulate the employment relationship between a U.S.

---

**18.** *See, e.g.,* International Convention on the Elimination of All Forms of Racial Discrimination, 660 U.N.T.S. 195, U.N. Doc. A/6014 (1965); Convention on the Elimination of All Forms of Discrimination Against Women, G.A. Res. 34/180, U.N. Doc. A/34/46 (1979).

Many of these agreements have been signed by the United States, but have not been ratified by the Senate. Most of the protections that the United States would owe to its citizens under these agreements are already provided by the Constitution and federal and state law. *See* 2 Restatement introductory note to Part VII at 150.

corporation and employees who are U.S. citizens, or whether it would make its administrative and judicial procedures available to a U.S. employee seeking to bring a grievance against a U.S. employer. A foreign state, applying the principles of section 403, could well conclude that exercise of its territorial jurisdiction would be unreasonable in such a case. Indeed, the cases relied upon by the majority include those in which the courts of the United States have declined to apply the protections of U.S. law in precisely that situation. *See, e.g., Benz v. Compania Naviera Hidalgo,* 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957) (declining to apply the Labor Management Relations Act to wage dispute between foreign employer and foreign crew although within the territorial jurisdiction of the United States).

International discord does not arise from the existence of concurrent jurisdiction alone as much as it arises from an attempt to regulate the conduct of foreign nationals.[19]

Cases involving extraterritorial application of the Lanham Act divide along precisely this line. Although other nations have concurrent jurisdiction to regulate the use of trademarks in their territory, the United States may, in the absence of an actual conflict of law, apply the Act to the conduct of U.S. nationals abroad. *Steele,* 344 U.S. 280, 73 S.Ct. 252; *American Rice, Inc. v. Arkansas Rice Growers Cooperative Ass'n,* 701 F.2d 408 (5th Cir.1983); *Ramirez & Feraud Chili Co. v. Las Palmas Food Co.,* 146 F.Supp. 594 (S.D.Cal.1956), *aff'd,* 245 F.2d 874 (9th Cir.1957), *cert. denied,* 355 U.S. 927, 78 S.Ct. 384, 2 L.Ed.2d 357 (1958). The Act does not, however, apply extraterritorially to foreign nationals. *Vanity Fair Mills v. T. Eaton Co.,* 234 F.2d 633 (2d Cir.), *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956).

The cases involving extraterritorial application of labor laws similarly demonstrate that an attempt to regulate the conduct of foreign nationals presents the most serious

affront to the sovereignty of other nations. In *Foley Bros.,* the Supreme Court refused to construe the Eight Hour Law to apply extraterritorially to a U.S. national employed by an American contractor in Iran. 336 U.S. 281, 69 S.Ct. 575 (1949). However, the Court emphasized that the Act did not distinguish "between laborers who are aliens and those who are citizens of the United States." *Id.* at 286, 69 S.Ct. at 578. The Court reasoned that if the law was applied extraterritorially to U.S. citizens, it "would be logically inescapable" that the law would apply to aliens employed abroad as well. *Id.* The Court was thus most troubled by the possibility that the law would by logical extension require an intrusion into the realm of "labor conditions which are the primary concern of a foreign country"—the labor conditions of its own citizens. *Id.*

The Court discounted an opinion of the Attorney General construing the Act to apply extraterritorially on the same grounds:

> The opinion ... proves too much. Although Attorney General Moody denied that incongruous results would flow from his interpretation, it would be anomalous, as we have said, for an act of Congress to regulate the hours of a citizen of Iran at work on a government project there.... Since the statute contains no distinction between laborers based on citizenship, Attorney General Stone's reasoning that aliens are not covered points to the conclusion that the statute does not apply to contracts which are to be performed in foreign countries.

*Id.,* 336 U.S. at 289, 69 S.Ct. at 579. The Court thus concludes that absent a distinction between aliens and U.S. citizens employed abroad, the Act must apply to both aliens *and* citizens employed abroad, or to neither. Therefore, because it would infringe upon the sovereignty of other nations to apply the Law to foreign nationals employed abroad, the Act could not be con-

---

**19.** In *Timberlane,* the Ninth Circuit suggested that extraterritorial application of the Sherman Act could be moderated to reduce international tensions by affording greater consideration to

the nationality of the parties. The court noted that "applying American laws to American citizens raises fewer problems than application to foreigners." 549 F.2d at 612.

strued to apply to citizens employed abroad.

Similarly, the Supreme Court in both *Benz v. Compania Naviera Hidalgo*, 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1956) (LMRA) and *McCulloch*, 372 U.S. at 21, 83 S.Ct. at 677–78 (NLRA), refused to "run interference in ... a delicate field of international relations" by construing U.S. labor laws to apply to foreign seamen employed on vessels registered under a foreign flag. While these cases involved principles unique to the law of the sea, the nationality of the parties was clearly a source of concern for the Court.[20]

The alien exemption provision of Title VII, which provides the strongest evidence of congressional intent to apply Title VII extraterritorially, eliminates the very factor which has barred the extraterritorial application of U.S. labor laws.[21] Because this provision insures that the statute will *not* intrude on the area of labor relations which is the "primary concern" of foreign nations, extraterritorial application of Title VII is unlikely to offend the sovereignty of other states. *See id.* Furthermore, there is no attempt in this case to impose the requirements of Title VII on foreign corporations employing U.S. citizens abroad—another area likely to be of "primary concern" to foreign states. I would conclude that "the rights of other nations or their nationals are not infringed" by extraterritorial application of Title VII, and therefore "the United States is not debarred by any rule of international law from governing the conduct of its own citizens ... in foreign countries." *Steele*, 344 U.S. at 285–

86, 73 S.Ct. at 255–56. This is not to say that extraterritorial application of Title VII would always be appropriate: it may not be, particularly in the case of an actual conflict of law. The possibility of such conflict is not, however, sufficiently great to render extraterritorial application of Title VII unreasonable.

In fact, Title VII contains provisions that allow conflicts with foreign law to be minimized. For example, this court has allowed an employer to use the bona fide occupational qualification (BFOQ) exception, 42 U.S.C. § 2000e–2(e), to assert the requirements of foreign law as a defense to a Title VII claim. *Kern v. Dynaelectron*, 577 F.Supp. 1196 (N.D.Tex.1983), *aff'd mem.*, 746 F.2d 810 (5th Cir.1984) (affirmed on basis of reasons stated by the district court). In *Kern*, the district court held that in extraordinary circumstances, a prohibited classification could itself be a BFOQ. *Id.* at 1201. The plaintiff had alleged discrimination on the basis of religion because Dynaelectron, a U.S. corporation which operated a helicopter pilot service in Saudi Arabia, employed only Moslem pilots to conduct flights from Jeddah to the holy city of Mecca. The employer asserted as his defense a Saudi law prohibiting non-Moslems from entering the holy area of Mecca. The penalty for violation of the law was severe—death by beheading. *Id.* at 1200. The court concluded that under the circumstances, religion was a BFOQ for the job of piloting flights from Jeddah to Mecca. *Id.* at 1201.

Although the availability of the BFOQ defense in cases of less extreme conflicts

---

**20.** Neither *McCulloch* nor *Benz* is cited in the Restatement's discussion of the presumption against extraterritoriality. *Benz*, however, is cited in the section on Law of the Sea. § 512 reporters' note 5 (jurisdiction over foreign vessels in port).

**21.** The majority cites several other examples of cases in which courts have refused to apply U.S. labor laws extraterritorially. These cases are readily distinguishable: First, the majority cites several cases holding that the Railway Labor Act does not apply extraterritorially. The RLA, however, incorporates a provision of the Interstate Commerce Act which explicitly restricts its application to carriers engaged in transporta-

tion within the United States. *See Air Line Stewards and Stewardesses Ass'n v. Trans World Airlines*, 273 F.2d 69, 71 (2d Cir.1959); *Airline Dispatchers Ass'n v. Nat'l Mediation Board*, 189 F.2d 685, 690 (D.C.Cir.), *cert. denied*, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951).

Second, the majority cites cases holding that the Age Discrimination in Employment Act does not apply extraterritorially. The ADEA, however, has been explicitly distinguished from Title VII because it does not contain a provision exempting aliens employed abroad. *Pfeiffer v. Wm. Wrigley, Jr. Co.*, 755 F.2d 554, 559 (7th Cir.1985).

with foreign law has not been tested, *Kern* indicates that the defense could provide a basis for reconciling legitimate conflicts.[22]

The argument that extraterritorial application of Title VII is unreasonable because it would offend the sovereignty of other nations is not persuasive. The fact that another nation may exercise jurisdiction over employment relations on the basis of territory does not render the exercise of U.S. jurisdiction on the basis of nationality unreasonable. The likelihood that concurrent jurisdiction would produce international discord is minimized by the fact that the United States seeks to regulate *only* the conduct of its own nationals and by the fact that Title VII may be reconciled with foreign law in the event of a conflict.

The fact that one could hypothesize particular situations in which the extraterritorial application of Title VII to U.S. citizens employed by U.S. corporations would conflict with foreign law does not compel a holding that Title VII may never extend its protections beyond U.S. borders. This construction of section 403 would place an untenable restriction on U.S. sovereignty. We would be required to defeat congressional intent to apply a statute extraterritorially unless Congress was able to anticipate and resolve every potential conflict of jurisdiction, or unless Congress met the *McCulloch* standard by expressing an affirmative intent to apply a statute extraterritorially whether reasonable or not. This would make extraterritorial jurisdiction an all or nothing proposition, eliminating a middle ground on which Congress could exercise extraterritorial jurisdiction in a

more limited fashion. This result is neither compelled by the Restatement nor desirable.

For the purposes of this case, the Restatement requires only that we conclude that extraterritorial application of Title VII would in general be reasonable. Because Congress *cannot* anticipate every conflict of law, it must necessarily rely on the courts to make a more individualized determination of the propriety of exercising extraterritorial jurisdiction in a particular case. The constraints of section 403 apply to exercises of prescriptive jurisdiction not only by Congress, but by all government entities.[23] The courts will therefore be guided in individual cases by the same principles of reasonableness that apply to our evaluation of Congress' initial exercise of extraterritorial jurisdiction.

Thus, while I would hold that extraterritorial application of Title VII would in general be reasonable, I would also recognize that it may be appropriate in some circumstances for a U.S. court to decline to apply Title VII extraterritorially. In the instant case, the factors that might influence a more individualized decision whether to apply Title VII extraterritorially have not been fully briefed and are therefore not considered here.

### III. The Language and Legislative History of Title VII

Since extraterritorial application of Title VII would not be unreasonable and therefore does not violate principles of interna-

---

**22.** I do not mean to suggest that courts should not continue to be sparing in their application of the BFOQ defense. In particular, courts should be wary of vague assertions of inconsistent legal requirements or cultural differences "which might afford [an employer] a pretext that [the granting of] relief would impugn foreign law." *Steele,* 344 U.S. at 280, 73 S.Ct. at 252 (no conflict where Mexican registration of trademark had been cancelled); *see also Fernandez v. Wynn Oil Co.,* 653 F.2d 1273 (9th Cir. 1981) (alleged chauvinism of South American businessmen should not provide basis for holding that being male was BFOQ); Note, *Equal Employment Opportunity for Americans Abroad,* 62 N.Y.U. L.Rev. 1288, 1301–11 (1987) (criticizing use of BFOQ defense as grounds to defeat

extraterritorial application of Title VII and as vehicle for avoiding conflicts of law).

**23.** Prescriptive jurisdiction is defined as jurisdiction of a state "to make its law applicable to the activities, relations, or status of persons, or the interests of persons in things, whether by legislation, by executive act or order, by administrative rule or regulation, or by determination of a court." Restatement § 401(a). The traditional equation of jurisdiction to prescribe with *legislative* jurisdiction was discarded in recognition of the increasingly complex relationship between the roles of different branches of government. *Id.* introductory note to Part IV at 230.

tional law, we do not need to search for an *affirmative* expression of congressional intent to apply Title VII extraterritorially. Rather, we may employ the traditional methods of statutory interpretation to determine whether the presumption against extraterritoriality is overcome by the "contrary intent" of Congress. *See Foley Bros.*, 336 U.S. at 285, 69 S.Ct. at 577–78; *Natural Resources Defense Council v. Nuclear Regulatory Comm'n*, 647 F.2d 1345, 1357 n. 54 (D.C.Cir.1981).

In asserting that Congress intended Title VII to apply extraterritorially,[24] Boureslan and Amicus EEOC rely primarily on the "alien exemption provision," 42 U.S.C. § 2000e–1, which provides in relevant part: "This subchapter shall not apply to an employer with respect to the employment of aliens outside any State." The stated purpose of this provision was "to remove conflicts of law which might otherwise exist between the United States and a foreign nation in the employment of aliens outside the United States by an American enterprise."[25] *Civil Rights: Hearings on H.R. 7152 Before the House Committee on the Judiciary*, 88th Cong., 1st Sess. 2303 (1963) (testimony of James Roosevelt, Member of Congress from the State of California) (explaining provisions of H.R. 405 which was incorporated into Title VII of H.R. 7152).[26]

Since Title VII expressly exempts from coverage aliens employed abroad by U.S. corporations, the logical negative inference is that Title VII was intended to cover U.S. citizens employed abroad. Indeed, the alien exemption provision would be meaningless if Title VII did not apply extraterritorially: there is no need to exempt aliens employed abroad from coverage if *no one* is covered abroad. Construction of a statute to render a provision meaningless violates the established rule of statutory construction which obliges a court "to give effect, if possible, to every word Congress used." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979); *accord United States v. Reeves*, 752 F.2d 995, 998 (5th Cir.1985) ("A statute should be read to avoid rendering its language redundant if reasonably possible."); *Goff v. Taylor*, 706 F.2d 574, 587 n. 34 (5th Cir.1983) ("It is well established that a statute should be construed so that each of its provisions is is given full effect; interpretations which render parts of a statute inoperative or superfluous are to be avoided."); *Quarles v. St. Clair*, 711 F.2d 691, 701 n. 32 (5th Cir.1983) (same); *Duke v. University of Texas at El Paso*, 663 F.2d 522, 526 (5th Cir.1981) (same); *Beisler v. Commissioner*, 814 F.2d 1304, 1307 (9th Cir.1987) ("We should avoid an interpreta-

---

**24.** It is not disputed that Title VII's definition of "employer" is sufficiently expansive to support application of Title VII beyond the territory of the United States. "Employer" is defined as any "person engaged in an industry affecting commerce" who has a specified number of employees who work a specified number of days. 42 U.S.C. § 2000e(b).

**25.** The majority dismisses this piece of legislative history, arguing that we must not "substitute legislative history for the language of the Act." The language of the statute is not, however, inconsistent with the legislative history. Both the plain language of the statute, interpreted according to the established canons of statutory construction, and the legislative history compel a single conclusion: that Congress intended Title VII to apply extraterritorially.

It is instead the majority's conclusion that Title VII does *not* apply extraterritorially that requires us to ignore the canons of statutory construction and the clear evidence of legislative history.

**26.** Contrary to the majority's assertion, the collaborative nature of Title VII's legislative history requires that these hearings be given special weight. H.R. 405 originated in the Committee on Education and Labor, but was incorporated by the Judiciary Committee into H.R. 7152. Title VII is thus a hybrid of bills originating in two committees. Although the Judiciary Committee subsequently amended H.R. 7152, the coverage provisions of Title VII, including the alien exemption provision, were not changed. Representative Roosevelt's explanation of the provisions of H.R. 405, based on the conclusions of the Committee on Education and Labor, is thus equivalent to a committee report for purposes of determining the objectives of the provisions that were incorporated wholesale from H.R. 405. Such discussions of statutory meaning are accepted as the most "persuasive indicia of congressional intent." *Mills v. United States,* 713 F.2d 1249, 1252 (7th Cir.1983), *cert. denied,* 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984); *see also Johnson v. Department of Treasury,* 700 F.2d 971, 974 (5th Cir.1983).

tion of the statute that renders any part of it superfluous and does not give effect to all of the words used by Congress.").

The majority maintains that it has not deprived the alien exemption provision of all meaning because another negative inference may be drawn from the provision:[27] that aliens are covered by the statute when employed within the United States. The majority relies for this proposition on *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95, 94 S.Ct. 334, 339–40, 38 L.Ed.2d 287 (1973), in which the Supreme Court held that Title VII applied to aliens employed in the United States but did not prohibit an employer from discriminating on the basis of citizenship or alienage. That is, Title VII protected aliens from discrimination on the basis of race, religion, color, sex, or national origin, but did not make alienage *itself* a prohibited classification.

The majority's reliance on *Espinoza* is misplaced. The Supreme Court does not rely solely on the negative inference it draws from the alien exemption provision, nor does it discuss the legislative history of the provision which supports the interpretation advanced by Boureslan and the EEOC. It would therefore be erroneous to conclude that the Supreme Court's passing reference in *Espinoza* to the alien exemption provision was intended to attach only one negative inference to the proviso.

A negative inference drawn from the alien exemption provision was not necessary to bring aliens within the scope of Title VII's domestic protections. As the Supreme Court notes in *Espinoza,* the use of the term "individual" in defining "employee" is sufficient to bring aliens within the statute's coverage. *Id.* Any construction of the term "individual"—as distinct from "citizen"—to exclude aliens would be inconsistent with principles of equal protection.[28] While the precise level of scrutiny applied to classifications based on alienage has varied,[29] it is well established that aliens are "persons" within the meaning of the fifth and fourteenth amendments, and are entitled to the equal protection of the laws of the United States. *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Truax v. Raich*, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915). Therefore, Congress could not have excluded aliens residing in the United States[30] from the coverage of Title VII without drawing an explicit distinction between aliens and citizens, and providing justification for the distinction sufficient to satisfy equal protection analysis under the due process clause. While it may be appropriate for the Supreme Court to cite the alien exemption provision in support of the obvious conclusion that aliens are covered by Title VII when employed in the United States, the majority's contention that this is the sole meaning to be attached to the provision is nonsensical. Given that aliens are "employees" within the meaning of Title VII in precisely the same sense that citizens are employees, it would be absolutely unnecessary to state that Title VII does not apply to aliens employed abroad unless the statute *did* apply to U.S. citizens employed abroad. Again, the majority's analysis renders the alien exemption clause completely superfluous, in violation of the canons of statutory construction. *See* cases cited *supra*.

---

**27.** The majority's assertion that the provision still has meaning because it means what it says—that aliens employed abroad are not covered—is purely semantic. As stated above, the alien exemption provision is completely superfluous if the statute does not cover *any* individual employed abroad. There is no difference between interpreting a statute to render a provision superfluous and interpreting a statute to deprive a provision of meaning: Semantic distinctions aside, both violate the canons of statutory construction. *See* cases cited *supra*.

**28.** Principles of equal protection are, of course, incorporated into the due process clause of the fifth amendment and therefore are applicable to acts of the federal government. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

**29.** *See* L. Tribe, American Constitutional Law 1544–53 (1988).

**30.** Equal protection principles "are universal in their application, to all persons within the territorial jurisdiction" of the United States. *Yick Wo*, 118 U.S. at 369, 6 S.Ct. at 1070–71; *see also* note 28 *supra*.

Congress' intent to apply Title VII extraterritorially is even more apparent if the alien exemption clause is read in light of the contemporary case law regarding the extraterritorial application of U.S. labor laws and the application of U.S. labor laws to foreign nationals. The Supreme Court appeared at the time to regard the application of U.S. law to *foreign nationals* as a primary source of conflict with other nations. *See* cases discussed *supra* in section II.

Congress' statement that the alien exemption provision was intended to avoid conflicts of law is perfectly logical in the context of this case law: Congress could reasonably have concluded that exempting aliens employed abroad would eliminate any obstacles to protecting U.S. citizens employed abroad by U.S. corporations.

Taken together, the language and legislative history of Title VII evidence a clear intent of Congress to apply Title VII to U.S. citizens employed abroad by U.S. corporations. This showing is sufficient to overcome the presumption against extraterritoriality. *See Mitchell*, 553 F.2d at 1002.

## IV. Conclusion

Although the issue presented in this case —whether Title VII applies to U.S. citizens employed abroad by U.S. corporations—appears simple on its face, its resolution turns on a complex interaction between international law and principles of statutory construction.

The majority errs in attempting to resolve the complex issues raised in this case through a single instrument of analysis: the presumption against extraterritoriality. In the process, the majority distorts the presumption and, in the name of judicial deference to the legislative branch, defeats congressional intent to apply Title VII extraterritorially—without reaching the issue that would justify its conclusion: whether extraterritorial application of Title VII would violate international law.

In order to more carefully evaluate whether the evidence of congressional intent presented in this case is sufficient to support an exercise of extraterritorial jurisdiction, I have employed a two-step inquiry.

The first inquiry is whether extraterritorial application of Title VII would violate section 403 of the Restatement which provides that as a matter of international law, a state may not exercise its jurisdiction to prescribe laws affecting persons or activities connected with another state when it is unreasonable to do so.

Applying the factors listed in the Restatement, it is clear that extraterritorial application of Title VII would not in general be unreasonable. First, the interest of the United States in applying its civil rights laws to its own nationals is sufficiently strong to support the exercise of extraterritorial jurisdiction and is consistent with the interest of the international community in eliminating discrimination. Second, extraterritorial application of Title VII would not offend the sovereignty of other nations because the statute does not attempt to regulate the conduct of foreign nationals. ARAMCO's contention that the United States should defer to the jurisdiction of other states to prescribe employment laws within their own territory would, in the absence of any actual conflict of law, place an untenable restriction on the sovereignty of the United States. The potential for conflict is minimized by the fact that Title VII may be construed to reconcile the competing demands of U.S. and foreign law when a conflict does occur.

Since extraterritorial application of Title VII would not violate the principles embodied in section 403, we do not need to search for an *affirmative* statement of congressional intent. The presumption against extraterritoriality may be overcome if the language and legislative history of Title VII express a clear (if not affirmative) intent to apply the statute extraterritorially. Applying the canons of statutory construction to the plain language of the statute and referring to the legislative history to determine Congress' intent, only one conclusion is possible: Congress intended that Title VII's protections would extend to U.S. citizens employed abroad by U.S. corporations.

While the exercise of extraterritorial jurisdiction necessarily raises sensitive issues of international law, U.S. employers should not be allowed to escape liability for discrimination by cloaking themselves in a conveniently acquired concern for the integrity of the sovereignty of foreign states. In holding that Title VII affords no protection from employment discrimination to U.S. citizens employed abroad by U.S. corporations, the majority defeats Congress' intent to the contrary. Because I believe that we could give effect to Congress' intent without intruding upon the sovereignty of other nations, I must respectfully dissent.